COMMONWEALTH *vs.* MATHEW McDONALD & another.

Middlesex.      May 21, 1928.— July 17, 1928.

Present: RUGG, C.J., BRALEY, CROSBY, CARROLL, & SANDERSON, JJ.

*Practice, Criminal,* Appeal with assignment of errors, Exceptions, General order, Verdict, Charge to jury, New trial.

The trial of an indictment for a felony other than murder or manslaughter shall be under the procedure established by St. 1926, c. 329, §§ 1 and 6; St. 1925, c. 279, only in those instances where the presiding judge exercises the discretionary authority vested in him to order such trial to be in accordance with such procedure.

A record and transcript of evidence, as originally presented to this court upon what purported to be, under § 33C, added to G. L. c. 278 by St. 1925, c. 279, § 1, and amended by St. 1926, c. 329, § 3, an appeal and assignment of errors alleged to have occurred at the trial of an indictment for assault with intent to rob, did not show the requisite order by the presiding judge that the trial should be under such procedure. The clerk of the court filed a supplemental certificate that, before the trial

of the case, a general order was made by the presiding judge to the effect that "all felonies in this session be tried" under G. L. c. 278, as amended by St. 1925, c. 279, and St. 1926, c. 329. In determining the case, this court treated the supplemental certificate as an amendment to the record and assumed that the order therein described was before the court rightly and was applicable to the case.

Where the trial of a felony is according to the procedure established by the sections added to G. L. c. 278 by St. 1925, c. 279, and amended by St. 1926, c. 329, no bill of exceptions should be allowed in the Superior Court or be entered in or considered by this court.

The circumstance that, according to the verdict of the jury, returned at the trial of an indictment charging a felony, where the order making the above statutes applicable has been made, the defendant is found guilty only of a misdemeanor does not cause the statutes to cease to operate: the proper procedure to bring the case to this court still is under those statutes.

An exception to the entire charge to the jury at the trial of an indictment is of no avail.

Upon the examination of the entire charge to the jury at the trial of an indictment, where the defendant had saved exceptions to specific portions of the charge on the ground that they were argumentative and in violation of G. L. c. 231, § 81, it was *held,* that the specified portions of the charge, although going to the verge of propriety, did not exceed the limits of judicial discretion and did not violate the rights of the defendants.

There can be no assignment of error at the trial of an indictment under G. L. c. 278, as amended by Sts. 1925, c. 279; 1926, c. 329, respecting a matter as to which exception might have been saved at the trial, unless there has first been such exception.

It is assumed that in appropriate instances this court has and will exercise the power to set aside a verdict in order to prevent a miscarriage of justice when a contention showing such miscarriage has not been made at the trial. Per RUGG, C.J.

At the trial of an indictment, the defendant made no requests for rulings. In his charge to the jury, the judge stated: "Well, the burden of proof is upon the government to satisfy you, to a moral certainty, that the defendants, or either of them, are guilty of this offence. If there be a reasonable doubt, upon all the evidence in the case, the defendants are entitled to the benefit of the doubt, and in such event the verdict would be 'not guilty.'" No exception was saved to a failure by the judge specifically to discuss the presumption of innocence. The defendant was found guilty. *Held,* that, while an instruction as to the presumption of innocence in a criminal case must be given if seasonably called to the attention of the judge, the record disclosed no ground for setting aside the verdict and ordering a new trial.

INDICTMENT, found and returned on February 7, 1928, charging Mathew McDonald and John A. Sheehan with assault upon Albert L. Hutton on November 20, 1927, with intent to rob him.

The indictment was tried in the Superior Court before *Dubuque*, J., on February 8, 9, 1928. The entire charge to the jury was as follows:

"The charge against these two defendants . . . is that . . . they made an assault on Albert L. Hutton, with intent to rob him; not that they robbed him, but an assault with that intent. That includes an assault, plus the intent to rob, which aggravates the assault.

"Now, it is said—and I must brush that aside in this case, and in every other case, because it comes up quite often — it is said that the defendants had been drinking; and of course you have drink spread all over almost every other charge of crime, and I must dispose of that drink part and that liquor part once for all, and in doing so I read to you from a decision of the Supreme Court, that is the highest authority in this State, and they make the law in this State. I read from the case of *Commonwealth* v. *Hawkins*, in 3 Gray, 466:

"'The rule of law is, that although the use of intoxicating liquors does to some extent blind the reason and exasperate the passions, yet, as a man voluntarily brings it upon himself, he cannot use it as an excuse, or justification or extenuation of crime. A man, because he is intoxicated, is not deprived of any legal advantage or protection; but he cannot avail himself of his intoxication to exempt him from any legal responsibility, which would attach to him, if sober.'

"So we leave out the question of drink. In any event, both defendants say that while they had been drinking, they remember everything that took place that night.

"Now let's look at the testimony offered by the Commonwealth. Hutton says that at about four o'clock in the morning he received a call from his office; that he goes to a place called the Famous Lunch, and that there he inquires for men who had called for a taxicab. The men are not there, but he goes outside and finds them in this cab. The defendants admit that that took place; they corroborate Hutton as to the call for a Checker taxicab, and the place, and they admit that they were in the cab, and they corroborate Hutton in that respect.

"There Hutton says that they asked him for liquor, where

they could get liquor.   Both sides agree as to that.   Hutton is corroborated in that respect by the two defendants.   Where they diverge on that question is that the defendants say that they asked him where to get liquor, and he, Hutton, told them at Brick Bottom, or South Street, or somewhere else there, whereas Hutton says that he didn't know where, and it was the defendants who told him where to go.   They diverge there, the defendants saying that Hutton knew about it and took them to a place where they bought a pint.

"Now, coming back again to the corroboration, Hutton testified that they got one pint of liquor and paid a dollar for it, and the defendants admit that that is so.   I guess they didn't testify as to the amount paid, but as to the fact of getting a pint of liquor, so Hutton is corroborated again by the defendants.

"Now, Hutton says that they told him that they were Yale students.   Both of them admit that they did, but they say they were jollying him.   Were they jollying him, or lying?   Were they making a false statement to him so that they could remain in his cab as long as they pleased, without paying for it?   In any event, they kept directing him to go to Arlington, or to go to some other place, and he kept going around and going up and down at various places.

"Again, Hutton says that they stopped in front of a house and Sheehan got out and went up the front steps and came down and went back, back with McDonald, both of them went back; and the defendants admit that this is so.   Corroboration of Hutton again.

"Where do they diverge?   They diverge when it comes to the essential and vital issue in this case; there is a difference between them when Hutton says he was assaulted by one of them, and that his pocket was turned wrong side out, and when he says that they asked him if he wasn't afraid, or if he had means of protection, or if this wouldn't be a good place for a holdup.

"Can you imagine any reason in the world why Hutton should tell that story if it wasn't true?   Hutton is interested in getting his fare, but this proceeding doesn't get him his fare.   If these young men were proceeded against for evad-

ing their fare, and put on probation and compelled to pay the fare, that might be something that might benefit Hutton if he hasn't been obliged to make up for the fare registered by the box or register in the taxi. It might help him in that respect, but this proceeding doesn't help him either one way or the other. He gets no benefit from it. Whether the defendants are convicted, or acquitted, it will make no practical difference to him, except that if Hutton's story is true, life in a taxi after twelve o'clock around this part of the State is not safe.

"Now, Hutton says that he was struck and he became unconscious for a short while, and when he woke up he found one of his pockets wrong side out.

"Now, I don't know whether you paid particular attention to the testimony. When these men talked about that being a place for a holdup and whether he had any means of protection, he immediately thought that he had some money in his pocket — I think he had $8 and something — and he had it in the right-hand side of his overcoat. He takes it very quietly and slips it into the left breast pocket of his overcoat. But that isn't the pocket that was wrong side out. It was the left-hand side pocket (indicating) that was wrong side out, as he testified, when he woke up from his unconsciousness after the blow.

"You see, if it had been the pocket from which he took the money quietly, you might feel from that that he might possibly have taken out the pocket at the same time that he took out the money, but it was the other pocket, the left-hand side pocket that was found wrong side out. That is his testimony, if you believe him.

"Now, is there anything in support of his testimony? He meets one of the men connected with the company, Mr. Mc-Farland, and Mr. McFarland finds him all excited, very nervous, and finds his garments, or his coat or clothing disarranged. He didn't notice anything about the buttons. Hutton says that the buttons were torn off, but he says that he noticed that this pocket was wrong side out.

"Well, now, afterwards he goes to the police station to tell his story — and it is stated that Mr. Duffy is a very efficient

officer. He may be; he may be. Has anybody ever seen a police roster, a police book, with the statement that is made by parties making complaints, and have it technically correct or accurate every time?

"He talks to Sergeant Duffy, tells him that some men have been running from their fare, and before the whole story is gone through, Sergeant Duffy says, 'Why, that belongs to Cambridge. I have no jurisdiction. It is out of my jurisdiction.' Hutton says he told him about being struck, and that these fellows beat him, or about being beaten, or something, and he says, 'Why, that belongs to Cambridge.' He doesn't go into particulars, as Hutton at that time was unable to say exactly the particular place or locate the particular section where this alleged assault took place. So Duffy doesn't remember that he told him that he was struck.

"Well, supposing he didn't tell him, does it follow that he wasn't struck by the defendants? Does it follow that because the defendants testify that they didn't strike him, that you are obliged to take that story? You are not obliged to take their story; you are not obliged to believe them. It is for you to say as to whether you will believe them or not.

"First, let's look and see. They were out on what they call a good time. Well, any sensible and level-headed Christian man would not say it was a good time. It was a bad time, if they were staying out for the purpose of drinking and misspending their lives, misspending their time, disabling themselves, doing injury not only to their bodies, but much more to their souls, spending their time drinking in the middle of the night, when they should be in their beds.

"Under those circumstances, when they lied to Hutton about their being Yale students, what did they lie about that for, as to being Yale students? What did they do that for? Wasn't it to lead him on so that he would carry them around as many places as possible before he asked for any money? If they were Yale students they were supposed to have some money to celebrate the great event of the Harvard-Yale game, or the great defeat, whatever it was. Being Yale students, they are supposed to have some money in their pockets, not to go bumming around, staying around street

corners and watching for an opportunity to get a drink here and a drink there, but men who had means, at least, or resources, to pay for what they ordered. Was that the reason why they represented to the taxicab man that they were Yale men?

"When a person is accused of crime, is charged with crime, and it appears from the evidence that they made misstatements and that they lied about it, you have a right to infer from the lie that that is evidence of consciousness of guilt.

"Now, they said they were kidding, they were jollying; they said they said it for fun; they were enjoying themselves. Well, you have heard their statement about it. It is for you to say as to whether you take that for con, [fun] or whether you don't.

"Now, the charge of assault with intent to rob is, as I said, a charge of assault, and the charge with intent to rob would make it a much more serious offence; but on the principle that the larger vessel may contain a smaller quantity, that a gallon jug may contain a pint, we apply that law of physics to the law of crimes, and we say that the larger crime includes the lesser offence. Assault with intent to rob contains the larger crime, but it contains the smaller crime of simple assault.

"Now, how does the Commonwealth contend that it was assault with intent to rob? The Commonwealth contends that the assault was committed, that the taxi man was knocked down or knocked unconscious, and that they went through his pockets, at least one of his pockets, and the evidence of it is the pocket turned wrong side out. That is evidence that they fished for money on his person and tried to get it, and if the money had been in that pocket, that they would have got it, drunk or sober. Now, do you believe that? It all comes back to the question as to whether you believe Hutton or not. You can't say, 'Two men swear one way, and one man swears the other, and which are we going to believe?' You have got to believe the evidence.

"I heard a judge of this court one time, when I was at the bar, make a statement, and I noticed it as being a very striking saying. He said, 'There are statements that one

would not believe even though they were made upon a stack of Bibles.' There are things that are said by men that wouldn't be believed no matter how much they swore to the statements. Does it look reasonable on its face? Does it look to be such a thing as you would expect to meet with?

"Hutton says that he met with the unusual experience not only of having two men who got his services, but who were robbing not only him, Hutton, but robbing the company. That is, I am using the word 'robbing' in the broad sense: they were depriving the company of its rights, using the gasoline and using the taxi, and not paying for it.

"They hold their drivers according to the register. He said he called for some money when the machine inside of the cab registered $4.40, and they put him off and put him off.

"Finally, they said, they went off and went to the defendant McDonald's house. Do you believe that? They admit that they left without paying the fare. Can you believe two young men who resort to this method of enjoying themselves by going around the better part of the night, or the morning, early morning, going around incurring a debt and then not paying for it? Can you imagine that as being something of a joy? To what sort of a mind and temperament and character can that be a joy?

"The men admit that they committed another offence. It is a criminal offence to use a taxicab and not pay for the fare; it is a criminal offence. They admit one offence. You have heard their statement as to what they did that night, what they admitted, so far as they admitted what they did. Under those circumstances would you believe their statement, even under oath? You are not obliged to take it. You have a right to take it. It is your duty to consider it, to weigh it, but you are not obliged to believe them. It is for you to say as to whether you believe them or not. . . .

"The possible verdicts are guilty of assault, or simple assault. 'Guilty' means guilty of the whole offence as charged. That means assault with intent to rob. If you find that they are guilty of less than the assault with intent to rob, then it would be guilty of simple assault, and the foreman would so

state. Then the other possible verdict would be 'not guilty' as to both defendants, or as to one.

"It is for you to say as to whether the offence is proved to you beyond a reasonable doubt. The burden of proof is on the government to satisfy you that the case is made out beyond a reasonable doubt. That means to a moral certainty. That doesn't mean that the number of witnesses on one side or the other must be so many or so much. . . .

"A former Chief Justice of our Supreme Court, Judge Holmes, now of the United States Supreme Court, said, 'We have a finer method of weighing evidence in Massachusetts than by counting noses.' Now, that was a humorous way of stating it. He was true to the humor of his revered father, Oliver Wendell Holmes, the author of 'The Autocrat of the Breakfast Table.' But that was his pungent, expressive way of saying that you get at the value of testimony by its intrinsic worth, by the worth, in itself, of the testimony, and not by counting the number of persons who testify one way or who testify the other.

"Naturally, the defendants are interested in testifying in their defence. Are they testifying here in such a way as to shield themselves and to free themselves from this serious charge? Well, that is a question for you to say, as to whether you think you can rely upon their testimony, or whether you think you can't.

"Would you be willing to trust yourselves to these young men? One of them says he is a taxi driver now. Would you be willing, after the story you have heard here, would you be willing to trust yourselves to Sheehan as a taxi driver, if you knew he was driving the taxi in some out-of-the-way place somewhere? Would you be willing to trust yourselves to McDonald under the same circumstances, or to be with him where it was dark and no one could see, and where all the evil instincts of nature are sometimes revealed and overexcited in such a way as to disregard entirely the duty that one owes to his fellow man? That is one way of trying to test as to whether you believe the testimony that these men give.

"Would you, on the other hand, trust yourselves to Hutton? Would you be willing to go with Hutton and to go

through even dark places or around dark corners, and all that sort of thing, from what you have seen of him here on the stand? Would you feel that you were in safe hands if Hutton was driving at the wheel? That is one way of testing the value of the testimony that Hutton gives in this case.

"Well, the burden of proof is upon the government to satisfy you, to a moral certainty, that the defendants, or either of them, are guilty of this offence. If there be a reasonable doubt, upon all the evidence in the case, the defendants are entitled to the benefit of the doubt, and in such event the verdict would be, 'not guilty.'"

The defendants were found guilty.

Proceedings with respect to exceptions and assignment of errors are described in the opinion.

The case was submitted on briefs.

*P. J. Delaney,* for the defendants.

*R. T. Bushnell,* District Attorney, *& R. S. McCabe,* Assistant District Attorney, for the Commonwealth.

Rugg, C.J. The defendants were tried upon an indictment which charged them with assault with intent to rob. The jury returned a verdict of guilty of simple assault as to each defendant. A bill of exceptions in ordinary form was allowed and has been prosecuted by the defendants. They also claimed an appeal founded upon exceptions, and seasonably filed assignments of errors alleged to have been committed by the trial judge during the trial; and this appeal with full transcript of the evidence and charge and exceptions saved during the same trial has also been prosecuted and the papers are before us. The defendants state in their brief that, in view of the verdict of the jury, they were in doubt as to the proper way to secure review of the errors of which they complain and have therefore presented both exceptions and appeal.

Recent statutes make clear the correct procedure. By St. 1925, c. 279, §§ 1, 2, a new practice was established regulating "any proceedings or trial upon an indictment for murder or manslaughter," whereby "no bill of exceptions shall be entered or considered in the Supreme Judicial Court in any such proceedings or trial," and whereby the evidence shall be

taken by a stenographer, exceptions seasonably saved shall be numbered consecutively in the transcript of the evidence, and a defendant who desires review of alleged errors by this court must file a claim of appeal in writing and also an assignment of errors as to such exceptions as he relies upon within times specified. The case comes to the full court as thus prepared. By St. 1926, c. 329, §§ 1 and 6, the practice established by St. 1925, c. 279, as to "proceedings or trial upon an indictment for murder or manslaughter" was extended to proceedings or trial "upon an indictment or complaint for any other felony" provided so ordered by "the justice of the Superior Court presiding at such proceedings or trial." As we interpret these statutes, they mean that trials in murder and manslaughter cases alone must imperatively be in accordance with the new practice, and that trials upon indictments or complaints for other felonies shall be in accordance with the new practice only in those instances where the presiding judge exercises the discretionary authority vested in him to order such trial to be in accordance with the new practice.

The "concise summary of the record" prepared by the clerk, § 33C, added to G. L. c. 278 by St. 1925, c. 279, § 1, and amended by St. 1926, c. 329, § 3, and "the transcript of the evidence" fail to show an order by the presiding judge that the trial of this case should be under the new procedure. It appears, however, from a supplemental certificate of the clerk that, before the trial of this case, a general order was made by the presiding judge to the effect that "all felonies in this session be tried" under G. L. c. 278, as amended by St. 1925, c. 279, and St. 1926, c. 329. This supplemental certificate is treated as an amendment of the record, and it is assumed that this order is before us and rightly was applicable to the case at bar. That assumption is in favor of the defendants because all the exceptions set forth in the bill of exceptions appear in the assignment of errors and there is also one assignment of error not set forth in the exceptions.

The circumstance that, according to the verdict of the jury, the defendants were guilty of a lesser offence, which is a misdemeanor, rather than of the full felony as charged in the

indictment, makes no difference with the procedure when the essential order has been made. The trial was upon the felony as charged in the indictment. It was within the province of the jury, if the evidence had led them to that conclusion, to have returned a verdict of guilty of the felony as charged. It is the trial and not the verdict which controls the procedure in cases like the present. The case must be considered on the assignments of errors made by the defendants, and the bill of exceptions is treated as improvidently allowed.

The defendants presented no requests for rulings, and took no exceptions until the close of the charge. Then they attempted to save an exception to the "whole charge, as being an argument upon the facts, for the Commonwealth." They also specified numerous particulars of the instructions as being obnoxious to an impartial submission of the case to the jury, and excepted thereto. All these exceptions are included in the assignment of errors. The exception to the entire charge and the assignment of error based thereon are of no avail. *Commonwealth* v. *Duncan*, 250 Mass. 405, 407. The other exceptions and assignments of errors based thereon have all been examined with care. It is not necessary to go over them one by one. The general principles which must govern a trial judge in charging a jury were stated with clearness and force in *Whitney* v. *Wellesley & Boston Street Railway*, 197 Mass. 495, 502, in words which frequently have been quoted. They need not be repeated. They have been followed and amplified in numerous more recent decisions. *Plummer* v. *Boston Elevated Railway*, 198 Mass. 499, 514, 515. *Kelley* v. *Boston*, 201 Mass. 86, 89. *Johnson* v. *Foster*, 221 Mass. 248, 252. *Sawyer* v. *Worcester Consolidated Street Railway*, 231 Mass. 215, 218. *Posell* v. *Herscovitz*, 237 Mass. 513, 515. *O'Neill* v. *Ross*, 250 Mass. 92, 96, 97. *Field* v. *Hamm*, 254 Mass. 268, 271. *Fegan* v. *Quinlan*, 256 Mass. 10, 13. *Buckley* v. *Frankel*, 262 Mass. 13, 16, 17. We are of opinion that the portions of the charge here assailed, although going to the verge of propriety, did not exceed the limits of judicial discretion and did not violate the rights of the defendants. Every disputed question of

fact was left to the jury for decision, with only such comment as was within the scope of the sense of duty of the presiding judge. No opinion was expressed as to the guilt or innocence of the defendants, and no suggestion made as to the verdict which ought to be rendered. It is not every expression in a charge falling short of our approval which is ground for sustaining exceptions. *Commonwealth* v. *Taschetta*, 252 Mass. 158, 161.

The final assignment of error is that "in no part of the judge's charge did he discuss the presumption of innocence." As already pointed out, there was no request for an instruction touching this matter. No exception concerning it was taken at the close of the charge or at any time during the trial. It first appears in the assignment of errors filed on the twenty-second day of March, 1928, the verdict having been returned on the ninth of the preceding month. Manifestly there can be no assignment of error under St. 1925, c. 279, and St. 1926, c. 329, respecting a matter as to which exception might have been saved at the trial, unless there has first been such exception. The first and essential step is the taking of an exception. Without that first step, the second step of filing an assignment of errors cannot be taken. An exception not included in the assignment of errors and an assignment of errors not based upon an exception cannot be treated as rightly presented to the full court. Any other interpretation of these statutes would be contrary to one of the purposes declared in the title of each, namely, "the elimination of delay" in the final disposition of the classes of criminal cases to which they relate. It would also be contrary to the long settled practice prevailing in this Commonwealth. *Commonwealth* v. *Dascalakis*, 246 Mass. 12, 24. The words of these recent statutes reveal no purpose to change this practice, but on the contrary tend to confirm it.

It is assumed that in appropriate instances this court has and will exercise the power to set aside a verdict in order to prevent a miscarriage of justice when a decisive matter has not been raised at the trial. *Commonwealth* v. *Dascalakis*, *supra*, page 25. A careful examination of this entire record

discloses no reason for the exercise of that power.   An instruction as to the presumption of innocence in a criminal case must be given if seasonably called to the attention of the judge.   *Commonwealth* v. *Madeiros*, 255 Mass. 304, 315, 316.   It is not every variance from the strict letter of what the law may require, if invoked during the trial, which does injustice or which warrants a new trial.  *Commonwealth* v. *Dascalakis, supra,* pages 26, 27.   *Commonwealth* v. *Madeiros,* 257 Mass. 1.   We perceive no ground for setting aside the verdict and ordering a new trial.

> *Judgment affirmed.*
> *Exceptions dismissed.*