ANNIE CAHALANE *vs.* SAMUEL POUST & another.

Suffolk.    February 7, 1956. — March 7, 1956.

Present: QUA, C.J., RONAN, SPALDING, COUNIHAN, & WHITTEMORE, JJ.

*Practice, Civil,* Charge to jury; Exceptions: general exception.

A general exception to the trial judge's charge in an action in which there were also specific exceptions to particular sentences in the charge brought before this court the full context of the sentences referred to in the specific exceptions.  [690]

A mere suggestion by a trial judge in his charge of the possibility that the jury might find a part of the testimony to be false did not contravene G. L. (Ter. Ed.) c. 231, § 81.  [691–693]

Exceptions of the plaintiff to the charge in an action were sustained
where it conveyed to the jury in unmistakable terms the impression
that the judge thought that certain relatives of the plaintiff as wit-
nesses at the trial had not told the truth in testifying favorably to
the plaintiff and inconsistently with signed statements given by them
to an investigator before trial, and that this might have been because
they had learned that there could be no recovery on their stories as
related in the statements. [693–694]

TORT. Writ in the Superior Court dated March 31, 1953.
The action was tried before *Morton, J.*

*Joseph Gorfinkle,* for the plaintiff.

*Sturtevant Burr,* for the defendants.

WHITTEMORE, J. This action of tort for personal injury
to the plaintiff by falling on steps of property owned by the
defendants resulted in a verdict for the defendants. The
plaintiff excepted to the judge's charge to the jury, in gen-
eral, and specifically to the statements "Counsel know what
they have to prove to get to the jury" and "Do you sup-
pose anybody talked with them afterwards?" The excep-
tions to the charge must be sustained.

In a number of cases we have held that a general excep-
tion to an entire charge cannot be sustained. See, for ex-
ample, *Commonwealth* v. *Duncan,* 250 Mass. 405, 407; *Com-
monwealth* v. *McDonald,* 264 Mass. 324, 335; *Perry* v. *Bos-
ton Elevated Railway,* 322 Mass. 206, 208. Other cases have
stated the rule applicable to a general exception to a part
of a charge to be that it is not sustainable unless substantial
injustice clearly appears. See *Callahan* v. *Fleischman Co.*
262 Mass. 437, 438; *Mansell* v. *Larsen,* 311 Mass. 607, 613,
614, and cases cited. We construe the general exception to
put before us the full context of the sentences referred to in
the specific exceptions.

The issue to which the relevant parts of the charge were
addressed was whether when the plaintiff fell there was a
hole in the steps. The plaintiff's sister and the latter's son,
both of whom testified to the fact of the hole, had made and
signed prior inconsistent statements. Each prior statement
was in the hand of an investigator and had been signed by

the witness after the witness had written that the statement had been read and was true.

The relevant parts of the charge are set forth in the margin.[1] So far as the charge suggested to the jury the

---

[1] "If you find there was a condition in that step such as they described, I have no hesitation in saying it is a legal defect. From my point of view, I don't know how you feel, this is a tremendously interesting case.

"We have a nice group of people here. You will have to determine whether there was a defect there as described by Mr. and Mrs. Cotter; but first, before you take that up, there are other things to consider. Mrs. Cotter said the steps were patched up by the landlord from time to time. Now, if he patched up those steps from time to time, I ask you to consider whether he let an indentation four or five inches long and an inch and a half deep remain there month after month, or whether he would let a hole in that step greatly increase for a year, — a man that had patched them from time to time and had a man as he says that had taken care of them. That was an awful defect; although I am not privileged to use adjectives, it was a bad defect as described by Mr. Cotter, and Mrs. Cahalane started down those steps. We don't know whether except for the injuries she claimed, she was in the same condition then as now as to weight and size. With that hole right in front of her, Mrs. Cotter says she did not even mention it to her sister. She says it was daylight. Now, what do you think about that? Certainly, you will find it is natural for anyone to say to a man or woman if they are going down a step that has a hole in it, or a defect such as they describe here to say at least 'Look out,' but no, they made no mention of that.

"The accident happened on March 22nd; suit was brought March 31st.

"Counsel know what they have to prove to get to the jury.

"We have some written statements here. These statements were not only signed by Mr. and Mrs. Cotter but in their own handwriting they said, 'I have read the above statement and it is true.' Now, bear that in mind. I will take up Mr. Cotter's first. Among other things, and you will have this with you, relative to the steps, it reads, 'I could not say whether there were any chipped or broken or worn places in these nine cement steps at the time Annie Cahalane fell, as I do not remember what the condition of the steps were at that time. I have no idea what caused Annie Cahalane to fall on the front steps.'

"Now, there is a nice little woman, Mrs. Cotter. She testified she didn't know what the man wrote down, and yet she signed it and in her own handwriting wrote 'I have read the foregoing and it is true.' Now, today she says that the man told her when he came in that he wanted to help her sister. Of course, that is not going to help her sister without showing some defect in the stairs, but among other things she said that she went and pointed out, I don't know whether she said a defect or a hole to him, and she said 'That is where my sister fell,' and the man is supposed to have said to her, 'I am not interested in defects.' Now, that puts it up to you, doesn't it? Three pages, and she signed each one of them. Then she said she read it over and it is true. I say, a nice group of people like this.

"I am not reading all Mrs. Cotter's statement because I am not interested in the rest of it, but you will have it with you. Here is a hole that was let go for six months, five inches in depth — that way, I don't mean up and down — and an inch and a half this way. And it reads, 'I can't say whether there were any chipped or broken or worn places in these nine cement steps at the time Annie Cahalane fell.' — That is what Mr. Cotter said. I am now dealing with Mrs. Cotter's statement. She says, 'I don't recall whether it was a clear, dry day out. I did not examine these front cement steps to see if there were any broken or chipped places, but I know there was no banana peels, grapes, rubbish or dirt on these front steps where Annie Cahalane fell. There

possibility of their finding that a part of the testimony was false it did not contravene G. L. (Ter. Ed.) c. 231, § 81. ("The courts shall not charge juries with respect to matters of fact, but they may state the testimony and the law.") Our decisions have consistently upheld the action of trial judges in putting before the jury possible conclusions warranted by the evidence in language that is "comprehen-

was no railings on these front steps where Annie Cahalane fell, but some time this past summer railings were put on both sides of these front steps. There are nine cement steps, and I never noticed any of these front steps being broken or chipped or worn. I have no idea what caused my sister Annie Cahalane to fall.' That is why I think the case is of tremendous interest.

"Now, you have a right to consider, — in fact, it is your duty to consider what occurred after this statement was filed. I think people feel sometimes that when you have steps as steep as these are, and Mr. Cahalane said they were pretty steep front steps and he was justified in that statement, I think you will find by looking at that picture, that somebody might fall, but falling down those steps would not in itself mean a claim for damages. Do you suppose anybody talked with them afterwards? I say you have a right to consider that, and you have a duty. We haven't any case unless we can say that there was a defect in the steps there that would cause somebody to fall going down, that the jury can find was a legal defect unreasonably there. And, of course, if it was there six months or a year, that charges the landlord with notice, so there is no question of notice, anyway. If he didn't go there, with any such condition as that he should know it if he didn't. Is that why they come in here and testify absolutely different from what they wrote down in their written statements which they signed?

"I don't suppose it makes much difference to you, but I say again I was tremendously interested in Mr. Cotter's statement, 'I have learned my lesson.' Now, what did he mean by that? You have a right to consider that. Did he write down a true statement at the time this happened, or is that a straightforward, truthful statement on the part of both of these people, Mr. and Mrs. Cotter? Did he learn his lesson perhaps on the witness stand? I don't know whether he learned it there from what he remembered about this statement, or whether he learned his lesson when he found out that falling down those steps was not enough, that there must be a defect. And of course, you must be satisfied, it must be proved to you that she fell in consequence of a defect, if one were there, because people do fall down, right on this floor, which is supposed to be non-skid as far as they can make them; and people fall downstairs, catching their heels. You might well find that on stairs, constructed as they were, without any railing, people catch their heels or slip and fall down. They must prove to you that the defect, if you find it was there, caused the fall.

"Now, if it were broad daylight and the defect was as described by Mr. and Mrs. Cotter, why I doubt if you would be warranted in finding there was any lack of care on the part of Mrs. Cahalane. It is for you to say. People don't have to look every place they put their foot, going up and down stairs. Sometimes perhaps you may feel they ought to take a little more care than they do walking along a sidewalk.

"I don't know as it would do any good to repeat or to make any further reference to what Mrs. Cotter said.

"I will say just one thing here. He said he signed this paper because the man came in and wanted him to sign it. Well, if you find they did not tell the truth, when they signed these statements and that the defect was there as described by them here at the time Mrs. Cahalane fell, she is entitled to a verdict; otherwise, not."

sively strong, rather than hesitatingly barren or ineffective." *Whitney* v. *Wellesley & Boston Street Railway,* 197 Mass. 495, 502. *Plummer* v. *Boston Elevated Railway,* 198 Mass. 499, 515. *Bernasconi* v. *Bassi,* 261 Mass. 26, 27–28. *Hohman* v. *Hemmen,* 280 Mass. 526, 529. *Hathaway* v. *Checker Taxi Co.* 321 Mass. 406, 410, and cases cited. And it is within the wide discretion of the judge to determine what parts of the evidence should be referred to. Inevitably there will be emphasis by selection and by reference but if the jury draw conclusions therefrom it will be primarily the facts of the case, properly marshalled for their review, and not the personal views of the judge, which will be speaking to them.

The charge here, however, went beyond a strong statement of possible conclusions open to the jury or a marshalling of relevant facts with appropriate selection and emphasis. It told the jury in unmistakable terms that the judge thought the witnesses to whom he was referring were not telling the truth and that this may have been because they had learned that on their stories as given to the investigator there could be no recovery.

The remark "Counsel know what they have to prove to get to the jury" must be considered with the later statements "Do you suppose anybody talked with them afterwards? . . . We haven't any case unless we can say that there was a defect in the steps . . . . Is that why they come in here and testify absolutely different from what they wrote down in their written statements which they signed?" and with the statements "I was tremendously interested in Mr. Cotter's statement, 'I have learned my lesson.' Now, what did he mean by that? . . . Did he learn his lesson perhaps on the witness stand? I don't know whether he learned it there from what he remembered about this statement, or whether he learned his lesson when he found out that falling down those steps was not enough, that there must be a defect."

In context the repetition of statements to the effect that this is a "tremendously interesting case" and that the witnesses were "a nice group of people" served to empha-

size the references to inconsistencies and motive for change in stories and further to convey the judge's own conclusions about the case. The repeated characterization of the witnesses as "nice" people must have been understood to state that the judge thought that the witnesses were in fact bad people as manifested by what they had done as outlined by the judge in the charge.

We have held that "It is not every expression in a charge falling short of our approval which is ground for sustaining exceptions." *Commonwealth* v. *McDonald*, 264 Mass. 324, 336. That case shows that where, as here, there are strong reasons for believing that one aspect of the case should be emphasized a charge embodying such emphasis will be sustained even though "going to the verge of propriety" (page 335). Notwithstanding aspects of similarity between the charge there reviewed and the charge before us, we are constrained to hold that what was said here went too far.

In *Commonwealth* v. *Foran*, 110 Mass. 179, 180, in sustaining exceptions to the charge, we said, "Although an instruction was added that 'the whole matter was before the jury to give such weight to the testimony as they saw fit,' yet the effect of the whole instructions was to throw the weight of the judge's opinion in the scales against the defendant." The words used in *Federal National Bank* v. *O'Keefe*, 267 Mass. 75, 83, are also applicable. "A careful study of the entire charge constrains us to the belief that the jury must have perceived the attitude, the bent of the mind of the judge, and that in all human probability they entered upon their final deliberations in a state of mind which was biased and interested." And see *Hayes* v. *Moulton*, 194 Mass. 157, 165, and *Commonwealth* v. *Barry*, 9 Allen, 276.

There were, likely, strong reasons for the judge holding the view of the case which we think his charge revealed to the jury, but if we are to determine the propriety of the charge to the jury by our view of the probable facts we shall to a degree be substituting judges for the jury as fact finders.

The question of the constitutionality of G. L. (Ter. Ed.) c. 231, § 81, has not been argued and we do not reach it.

See *Federal National Bank* v. *O'Keefe,* 267 Mass. 75, 82–83; *Whitney* v. *Wellesley & Boston Street Railway,* 197 Mass. 495, 502; *Langan* v. *Pianowski,* 307 Mass. 149, 152; *Beers* v. *O'Brien,* 316 Mass. 532; 19 Mass. L. Q. (No. 1) 103; 21 B. U. L. Rev. 43. Whether under art. 29 of the Declaration of Rights or the statute, we think that parties whose witnesses may have lied and whose case may have other suspicious aspects are entitled as are other litigants to have all the relevant facts including the possible bad actions of parties or their witnesses determined by the jury without such direct indication of the judge's personal conclusions as was here given.

*Exceptions sustained.*