Commonwealth *vs.* Alfred H. Lewis.

Middlesex.   April 1, 1963. — July 9, 1963.

Present: Wilkins, C.J., Spalding, Cutter, Kirk, & Spiegel, JJ.

*Breaking and Entering. Larceny. Intent. Practice, Criminal,* Fair trial; Exceptions: whether error shown, general exception. *Evidence,* Leading question, Relevancy and materiality, Competency, Illegally seized material, Stated ground of objection. *Error,* Whether error shown. *Search and Seizure.*

A finding of a breaking by one within G. L. c. 266, § 18, preceding his entry into a breezeway between a house and its garage was not warranted where, although the front door of the breezeway was closed, there was no evidence that its rear door was closed or whether he entered the breezeway through its front door or its rear door.   [377]

A finding of a breaking and entry within G. L. c. 266, § 18, was warranted by evidence that one unlocked the outer kitchen door of a house with a knife and slowly opened the door.   [377]

A finding of an "intent to commit a felony" within G. L. c. 266, § 18, by one who broke and entered a house in the daytime was warranted by evidence that upon being confronted by its occupant he asked whether he could mow the lawn, although he had no equipment, that he ran away from the premises when refused work and into woods when he observed a man nearby, and that he was soon seen in a swamp up to his knees in water.   [377–378]

Where evidence at the trial of an indictment under G. L. c. 266, § 18, warranted a finding that the defendant broke and entered a house with intent to steal, the jury was not required to find that he intended to limit his stealing to property under $100 in value in order to avoid a larceny amounting to a felony under § 30.   [378]

A defendant convicted of a crime by a jury was not deprived of a fair trial by the "cumulative effect of tension between the Court and the

Commonwealth *v.* Lewis.

defendant's trial counsel" where it appeared that the tension was created by that counsel through his ignoring or flouting rulings, which caused rebukes and warnings by the judge, some of them in the presence of the jury, that he did not "maintain . . . [a] respectful attitude" toward the judge and at times was downright discourteous, that he deliberately tried to goad the judge into some prejudicial action, and that the judge in his charge warned the jury not to be influenced in any way by what had occurred between him and the defendant's counsel. [378–379]

No error appeared in the allowance of leading questions to a witness for the Commonwealth at a criminal trial, or in the admission, upon a proper question, of an ambiguous answer which the defendant could have clarified on cross-examination. [380–381]

No error prejudicial to the defendant at a criminal trial was shown by the record in the exclusion, on cross-examination of a witness for the Commonwealth, of a question as to her testimony at a prior trial of the case incompleted through declaration of a mistrial. [381]

There was no error harmful to the defendant at a trial for breaking and entering a house with intent to commit larceny in permitting a witness to testify that after seeing the defendant running away from the house the witness telephoned to the police. [381]

On evidence at a criminal trial that a police officer had observed the defendant in a swamp wearing gloves which he was not wearing when he emerged from the swamp, and that later the officer found a pair of gloves at a spot in the swamp where the defendant had "thrashed around," the gloves found were not illegally seized and were "adequately connected" with the defendant, and there was no error in admitting them in evidence. [381–382]

No error was shown at a criminal trial in denial of a motion by the defendant to strike testimony as to articles found in a search of his person when he was arrested by a police officer where the ground of the motion was merely that the arrest had been made without a warrant. [382–383]

Where the defendant at the trial of a criminal case specifically asserted the fact that he had been arrested by a police officer without a warrant as the ground of a motion to strike testimony respecting articles found in a search of his person by the officer at the time of the arrest, the defendant was not entitled in this court to contend that denial of the motion was error in that the arrest had been made without probable cause. [383]

An exception to the entire charge to the jury at the trial of an indictment is of no avail. [383]

INDICTMENT found and returned on September 12, 1961.

The case was tried in the Superior Court before *Lurie, J.*

*Lawrence D. Shubow* (*Francis J. Vita* with him) for the defendant.

*Aaron K. Bikofsky,* Assistant District Attorney (*Ruth I. Abrams,* Assistant District Attorney, with him), for the Commonwealth.

SPALDING, J.   The defendant was convicted on an indictment which charged that on August 28, 1961, "in the daytime [he] did break and enter the . . . dwelling house of John Scanlon . . . with intent therein to commit larceny." G. L. c. 266, § 18.   He has appealed pursuant to G. L. c. 278, §§ 33A–33G, assigning as errors the denial of his motion for a directed verdict, various rulings on evidence, and other matters.

1.   We are of opinion the defendant's motion for a directed verdict (first assignment of error) was properly denied.   Mrs. Anastasia Scanlon, called by the Commonwealth, testified as follows: She first saw the defendant about noon on August 28, 1961, at her residence on North Avenue, Weston.   She had been bathing her mother in a bathroom not far from the kitchen when she heard a noise, went into the kitchen, and saw the outer door of the kitchen, which led to a "breezeway," slowly opening.   She slammed the door shut and then, looking up, saw the defendant standing in the breezeway.   A conversation ensued, apparently conducted through the closed door, and the defendant, when asked by the witness what he wanted, asked her whether he could mow the lawn.   She inquired of the defendant whether he had any equipment with him and he replied that he had none.   She suggested that he "go next door," and he left.   The breezeway, which was between the kitchen and the garage, had a front door, and a rear door leading to a yard, in addition to the door to the kitchen. There was no door between the breezeway and the garage. The kitchen door and the front breezeway door had been locked just before the occurrence of the foregoing events. There was a bell outside the breezeway and another outside the kitchen.   Both bells were in working order, but Mrs. Scanlon had not heard any bell ring about this time.   Later that day she observed notches, which she had not seen earlier, near a lock; it is not clear whether this observation referred to the front breezeway door or to the kitchen door.

Emma Lee DeCrosta, who lived in the second house away from Mrs. Scanlon's, testified that she first saw the defend-

Commonwealth *v.* Lewis.

ant running from Mrs. Scanlon's boundary line toward the street, and after attempting, without success, to "thumb" a ride in a passing automobile, run across the street and into the woods. She thereupon called the police.

Thomas Healey, a Weston police officer who lived near by, testified as follows: Around noontime on August 28, while off duty and at home, he saw the defendant walking fast across a ridge on the swampy side of an old pasture. The defendant, upon observing him, ran into the woods. Healey went into his house, put on his uniform and set out to find the defendant. He "spotted" the defendant in a swamp. At that time the defendant was up to his knees in water and was pushing brush away. While he was so engaged, he was wearing gloves. A search of the defendant by Officer Healey revealed two small knives and $57. At the time of the search the defendant was not wearing gloves. The defendant was placed under arrest and taken to the police station. Later, Officer Healey returned to the swamp and found a pair of gloves in a "round spot where [the defendant] had thrashed around." The defendant, when asked about the knives, stated that he used them to manicure his fingernails. During the course of an interrogation by the police, the defendant stated that he went to Weston looking for "lawn work," although he had never done such work before and had no equipment; he admitted that he had been in the Scanlon house and stated that he went there looking for work.

On the basis of the foregoing testimony the jury could have found that the defendant entered the breezeway of the Scanlon house, went to the kitchen door, unlocked it with a knife and caused the door to open, and then, after a conversation with Mrs. Scanlon, left the premises. The question presented by the motion for a directed verdict is whether this evidence is sufficient to support a conviction under G. L. c. 266, § 18, which defines the offence: "Whoever, in the night time, enters a dwelling house without breaking, or breaks and enters in the day time a building . . . with intent to commit a felony . . . ." The defend-

ant's acts, committed in the daytime, required a breaking
and an entry, as in the case of burglary at common law,[1] to
constitute the offence charged.

In this Commonwealth the opening of a closed but un-
locked door or window is a breaking. *Commonwealth* v.
*Stephenson,* 8 Pick. 354. But passing through an unob-
structed entrance is not. *Commonwealth* v. *Strupney,* 105
Mass. 588, 590. See *Commonwealth* v. *Trimmer,* 1 Mass.
476. There was no evidence that would enable the jury,
without resort to conjecture, to determine whether the de-
fendant entered the breezeway through its front or rear
door. Nor was there evidence that the rear door was
closed shut either at that time or habitually. See *Common-
wealth* v. *Domanski,* 332 Mass. 66, 76–77. Thus, the de-
fendant's entry into the breezeway was not proved to have
been effected or preceded by a breaking.

Even though the defendant, by whatever means, had en-
tered the breezeway, without breaking, there would, never-
theless, be a breaking if he opened the kitchen door. *Com-
monwealth* v. *Stephenson,* 8 Pick. 354. *State* v. *Scripture,*
42 N. H. 485, 488. 4 Blackstone, Commentaries, p. 226.
But, as in the case of burglary at common law, there must
also be an entry. "It is well settled that it is a sufficient
entry 'when the thief breaketh the house, and his body, or
any part thereof, as his foot or his arm, is within any part
of the house.' 3 Inst. 64. 1 Hale P. C. 551. 2 East P. C.
490." *Commonwealth* v. *Glover,* 111 Mass. 395, 402. We
are of opinion that the jury could fairly have inferred that
in the course of his opening the door some portion of the
defendant's hand or arm came within the house. That was
enough to constitute an entry.

But on an indictment drawn under G. L. c. 266, § 18, the
Commonwealth must prove not only a breaking and enter-
ing but that it was done "with intent to commit a felony."
"When a person, by the use of force, enters a dwelling

[1] Burglary at common law is the breaking and entering into the dwelling
house of another in the night time with intent to commit a felony. 4 Black-
stone, Commentaries, p. 224.

Commonwealth *v.* Lewis.

house in the middle of the night it may ordinarily be pre-
sumed, in the absence of evidence to the contrary, that his
intent is to steal.'' *Commonwealth* v. *Ronchetti,* 333 Mass.
78, 81.   Even though the breaking and entering occurred
during the daytime, the intent to commit a felony could be
inferred from the defendant's conduct (taking to the woods
after being refused work) immediately thereafter.   In this
respect the case at bar closely resembles *Commonwealth* v.
*Shedd,* 140 Mass. 451, where it was said that the jury
''might well have inferred, from the circumstances attend-
ing the act, and from the conduct and declarations of the
defendant [flight and contradictory statements], that the
act was done for the purpose of stealing from the building.''
(P. 453.)

The defendant argues that the Commonwealth has not
introduced any evidence to show that he had an intent to
commit a larceny which amounted to a felony.   A felonious
larceny must involve property in excess of $100 in value.
G. L. c. 266, § 30.   If the jury believed that the defendant
entered the Scanlon home to steal, they were not required
to find that he intended to limit his stealing to property
under $100 in value.

2.   The second assignment of error asserts that ''The
cumulative effect of tension between the Court and the de-
fendant's trial counsel deprived the defendant of a fair
trial.''[1]   In support of this assignment of error, the de-
fendant refers to forty or more instances in the transcript.
These must be read in context and it would greatly prolong
this opinion to discuss them specifically.   That there was
tension between counsel and the court cannot be denied.
From a careful reading of the transcript, we are of opinion
that the tension of which the defendant complains was cre-
ated by his counsel.[2]   It is difficult, of course, to capture
the atmosphere of a trial from the printed record.   But

[1] Prior to the trial under consideration there had been two mistrials; one
of these occurred before another judge about three months before the present
trial; the other took place on the same day that the present trial commenced,
and both were before the same judge.   What brought about these mistrials
does not appear and we mention it only to show the setting in which the trial
commenced.

[2] The defendant's trial counsel did not argue the appeal in this court.

even from the record certain conclusions are inescapable. Repeatedly in the course of the trial, the defendant's counsel ignored or flouted rulings of the judge. It thus became necessary for the judge to warn or rebuke counsel. At times counsel's defiance of the court's rulings went so far that the judge threatened to adjudge him in contempt. Some of these rebukes and warnings were not in the presence of the jury; others, unavoidably, were. Often during colloquies counsel did not "maintain [the] respectful attitude" toward the court enjoined by the canons of the profession, and at times he was downright discourteous.[1] We are convinced that trial counsel embarked in a deliberate and studied attempt to antagonize the judge with the hope that he would be goaded into some action that would result either in a mistrial or a reversal. Conduct of this sort is not to be tolerated, and when it occurs it should be dealt with, as it was here, with firmness. A judge in this Commonwealth in order to discharge properly the function of his office must be "the directing and controlling mind at the trial, and not a mere functionary to preserve order and lend ceremonial dignity to the proceedings." *Whitney* v. *Wellesley & Boston St. Ry.* 197 Mass. 495, 502. Possibly some of the remarks made by the judge during the colloquies were not as judicial as they might have been. But, considering the provocation, we are of opinion that he showed great patience and restraint. It would be a reproach to the administration of justice if a defendant, through his counsel, could pollute the atmosphere of a trial and then turn this to his own advantage on appeal. The judge in his charge warned the jury not to be influenced in any way by what had occurred between him and counsel.[2]

[1] Canon 1 of the Canons of Professional Ethics of the American Bar Association reads in part, "It is the duty of the lawyer to maintain towards the courts a respectful attitude, not for the sake of the temporary incumbent of the judicial office, but for the maintenance of its supreme importance."

[2] This portion of the charge reads: "The only matter that you are to consider is the evidence that you have heard on this witness stand from these four witnesses who appeared. Nor is this defendant to be punished because of the colloquies that I have engaged in with his counsel. I require no protection from a jury. This jury knows that I am fully able to protect myself. And, therefore, in so far as the discussions between . . . [defence counsel] and myself and the actions that took place here, this has nothing to do with this defendant."

The defendant takes nothing by the second assignment of error.

3. The defendant's third assignment is based on certain questions, alleged to be leading, which the judge permitted to be put to a principal witness for the Commonwealth. This assignment is lacking in merit. "We are aware of no decision in this Commonwealth in which exceptions have been sustained because of the allowance of leading questions." *Guiffre* v. *Carapezza,* 298 Mass. 458, 460.

4. As stated above, there were three doors in the breezeway, a front door and a rear door and one leading to the kitchen. There was evidence that the front door and the door to the kitchen were locked immediately prior to the alleged offence. On direct examination Mrs. Scanlon was asked whether later in the day (after the defendant had departed) she had examined "the portion of the breezeway door, or the kitchen door near where the lock is," and she replied that she and her husband had done so. The following then occurred: "Q. And what did you observe? A. Notches in the front of the breezeway." COUNSEL FOR THE DEFENDANT: "I object." THE COURT: "I will take the answer." COUNSEL FOR THE DEFENDANT: "May I take an exception?" THE COURT: "Exception may be noted." We put to one side the fact that the objection was not made until after the witness had answered (see *Commonwealth* v. *Geagan,* 339 Mass. 487, 513), for it is conceivable, as is often the case, that the answer was made so soon after the question that counsel did not have sufficient opportunity to object. The defendant now urges (assignment No. 4) that it is not clear whether the answer referred to the front breezeway door or the kitchen door. If, he argues, the notches were made on the front door the evidence was immaterial, since there was no evidence that he came in by that door. Nor, he contends, was there any evidence as to the nature of the notches or their connection in opening the lock, or whether they could have been made by a pocket knife. We are of opinion that the admission of this evidence was not erroneous. The question was proper. If

the answer was ambiguous the defendant had ample opportunity to clarify it, for he cross-examined Mrs. Scanlon at some length about the locks.

5. At this, the third trial, counsel for the defendant asked Mrs. Scanlon whether, during a portion of her testimony at the incompleted second trial, she had made any mention of the notches she had observed at the door. We assume that evidence of this sort might, if the circumstances were fully explained, be admissible for purposes of impeachment. See *Commonwealth* v. *Homer,* 235 Mass. 526, 532–533. But there is nothing to show what the posture of her testimony was (whether complete or incomplete) at the time the second mistrial was declared. The defendant has the burden of showing that the ruling was erroneous and this he has failed to do. We are of opinion, therefore, that the exclusion of this question was not prejudicial.

6. Mrs. DeCrosta, a witness for the Commonwealth, was permitted to testify, subject to the defendant's exception, that after seeing the defendant running from the Scanlon house, she telephoned to the police. Assignment of error 8. This evidence did not harm the defendant, for it added little or nothing to her testimony that she had observed the defendant running away. No part of the conversation between her and the police was introduced.

7. The Commonwealth, subject to exception of the defendant, introduced a pair of gloves in evidence. Assignment of error 12. The defendant argues that this evidence was obtained by an illegal search in violation of his constitutional rights. The undisputed evidence shows that the gloves were found by the police officer in a swamp located near the Scanlon property. Finding the gloves violated no rights of the defendant. In *Hester* v. *United States,* 265 U. S. 57, it was said per Holmes, J., at page 59, that the "special protection accorded by the Fourth Amendment to the people in their 'persons, houses, papers, and effects,' is not extended to the open fields." See *Abel* v. *United States,* 362 U. S. 217, 241. There was no evidence

that unlawful actions of the police led to the defendant's abandoning the gloves. See *Commonwealth* v. *McCleery,* 345 Mass. 151, 153.

The defendant also contends that the gloves were not "adequately connected" with him. Officer Healey testified that the defendant wore gloves while in the swamp and that he was not wearing gloves when he emerged. In addition, the gloves were found in the area where the officer has said he noticed the defendant had "thrash[ed] around." The gloves were adequately connected with the defendant and the trial judge did not err in admitting them. See *Commonwealth* v. *O'Toole,* 326 Mass. 35, 39.

8. The defendant excepted to the denial of his motion to strike certain testimony relating to his possession of two penknives. Assignment of error No. 14. Even though a hearing had been held in the District Court and two previous trials had ended in mistrials, the defendant made no motion to suppress the evidence before the present trial commenced. Generally, an attempt to exclude such testimony is not timely if made for the first time when the evidence is offered at the trial. *Segurola* v. *United States,* 275 U. S. 106, 111. See *Commonwealth* v. *Spofford,* 343 Mass. 703, 708; *Commonwealth* v. *Laudate,* 345 Mass. 169. Assuming, however, that an objection would be proper if the defendant first learned of the illegal search and seizure during the course of the trial (*Gouled* v. *United States,* 255 U. S. 298, 305; *Agnello* v. *United States,* 269 U. S. 20, 34; Rule 41 (e) of Federal Rules of Criminal Procedure, 18 U. S. C.; Maguire, Evidence of Guilt, pp. 233–234) he still was required to make a timely objection to the evidence when first offered. This he did not do; the evidence was first admitted without objection. It is conceivable that the defendant could not assert any constitutional right until he first learned from the arresting officer the circumstances of the arrest. The defendant first moved to strike the evidence when the officer testified that he made the arrest without a warrant. But the fact that the arrest was made without a warrant does not necessarily render the evidence

objectionable.   Not all arrests need be made pursuant to a warrant.   *Commonwealth* v. *Phelps,* 209 Mass. 396, 410. *Commonwealth* v. *Holmes,* 344 Mass. 524.   But if the arrest is made without a warrant, the evidence, "to be admissible, must be the product of a search incident . . . [to an arrest] based upon probable cause."   *Ker* v. *California,* 374 U. S. 23, 34–35.

We need not consider whether the defendant was arrested without probable cause because he did not raise that point at the trial.   There he urged the exclusion of the evidence on the ground that the arrest was made without a warrant.   Here, he argues that it should be excluded on the ground that the arrest was made without probable cause. This he cannot do.   *United States* v. *Jones,* 204 F. 2d 745, 748–749 (7th Cir.).   See *Kagan* v. *Levenson,* 334 Mass. 100, 106; *Foster* v. *Everett,* 334 Mass. 14, 18.

9.   The defendant's fifteenth assignment is based on a general exception to the charge on the ground that it was "improperly weighted" in favor of the Commonwealth. Concerning a similar exception we said, "[t]he exception to the entire charge and the assignment of error based thereon are of no avail."   *Commonwealth* v. *McDonald,* 264 Mass. 324, 335.   We might add that an examination of the charge convinces us that it was not "weighted" in favor of the Commonwealth; on the contrary it was eminently fair.

*Judgment affirmed.*