COMMONWEALTH vs. MICHAEL BINKIEWICZ
(and seven companion cases[1]).

Middlesex.    April 3, 1961. — June 9, 1961.

Present: WILKINS, C.J., SPALDING, WILLIAMS, WHITTEMORE,
& CUTTER, JJ.

*Practice, Criminal,* Continuance; Assistance of counsel; Amendments;
Charge to jury; Exceptions: whether error harmful. *Pleading, Criminal,* Bill of particulars. *Larceny. Conspiracy. Evidence,* Accomplice, Relevancy and materiality, Credibility of witness, Hospital record, Exhibit, Competency, Assertion of innocence. *Witness,* Credibility.
*Error,* Whether error harmful.

A defendant indicted for serious offences in April and May whose chosen
counsel filed an appearance in April and a motion for particulars in
May showed no error or prejudice in the denial on June 12 of a motion
for a continuance until September because of his counsel's serious illness and inability to try the case, which had been assigned for trial on
June 18, where it appeared that on June 18 the defendant stated that
he would accept the services of counsel then appointed by the court "if
said counsel was given sufficient opportunity to prepare an adequate
defence," and that at the opening of the trial on June 20 the court-appointed counsel, although he then stated that the defendant wanted
him "to put on record . . . [the defendant's] objections to going forward and . . . [asked] his exceptions be saved," did not contend that
more time was needed to prepare the case.    [743–746]
There was no error in the denial of a motion by a defendant indicted and
tried with another defendant for a continuance because of inability of
the codefendant's chosen counsel to try the case and alleged unwillingness of the codefendant "to testify or in any manner participate" in the
trial without him, where it appeared that the codefendant intended to
coöperate with counsel appointed by the court for the codefendant and
that such coöperation ensued at the trial.    [746–747]
There was no abuse of discretion in the denial of a motion for a bill of
particulars to an indictment drawn in the language of the statute and
not appearing to be insufficient in setting forth the crime charged.
    [747]
Under G. L. c. 277, § 35A, c. 278, § 9, there was no prejudice to the defendant in allowing an indictment charging him with stealing an auto-

---

[1] Two of the companion cases are against Michael Binkiewicz, three are against Donald Painten, and two are against George E. Hayes.

mobile "of the property of" a designated person to be amended by inserting in place of that person's name the name of his wife, who owned the automobile, where it appeared that the automobile was in the actual or constructive possession of the husband and the wife and was subject to their several dominion and control.   [747–748]

There was no error at the trial of an indictment in a statement in the charge summing up certain testimony and apparently dealing with an argument of the defendant which sought to discredit testimony of an alleged accomplice of the defendant as a witness for the Commonwealth. [749–750]

At the trial of indictments for stealing an automobile one night and for conspiring with three others to steal it, there was no impropriety in statements in the charge that "You could find from . . . [certain] evidence [summarized by the judge], if you believe it, that all four were engaged in the conspiracy of stealing a car that night," and that an inference would be warranted that the defendant was familiar with "starting a car, without using an ignition key," by means of a clip of "the same kind . . . that was found in" the defendant's automobile and in another automobile which had been in his possession.   [751]

At the trial of indictments against three defendants arising out of an enterprise involving robbery, stealing an automobile, and conspiracy, at which a fourth person alleged to be involved in the crimes testified as a witness for the Commonwealth, a statement in the charge, after the judge had summarized uncorroborated testimony of that witness admitting his participation and incriminating the defendants, "take all those things together and ask yourselves 'Did . . . [the witness] make this up?' 'What motive had he for bringing these other people into it if they weren't engaged in that enterprise with him,' " merely presented to the jury possible conclusions from the evidence and was not a prejudicial expression of the judge's personal belief of the witness's testimony.   [752–753]

There was no error at a criminal trial in the judge's failure to charge that there was no testimony corroborating the testimony of an alleged accomplice of the defendant upon which conviction of the defendant depended.   [753]

A conviction at a criminal trial may be founded on the uncorroborated testimony of an alleged accomplice of the defendant.   [753]

Evidence at the trial of an indictment for conspiracy warranted findings that the stealing of an automobile was pursuant to a plan of the defendant and three others to steal it, that the defendant joined in the plan as a result of talk with some one of the others, and that he was guilty, even if there was no evidence of the talk which led the defendant to join in the plan.   [753–754]

At the trial of indictments for serious offences, it was error to elicit testimony from a witness for the defendant on cross-examination that while in the United States Navy the witness had been absent without leave and had been given a bad conduct discharge; but the error was not prejudicial to the defendant since the witness's testimony concerned only an unimportant collateral matter.   [754–756]

No error was shown at the trial of an indictment in the exclusion of the "hospital records" of a witness for the Commonwealth at Norfolk Prison Colony where a preliminary finding was not required that the records were records of a hospital within the description of that word in G. L. c. 111, § 70.   [756–757]

A cartridge found in a stolen automobile was properly admitted in evidence at the trial of indictments for stealing the automobile, armed robbery, and conspiracy, when offered through a witness for the Commonwealth who · described precisely where he had found the cartridge and accounted for it at all times.   [757]

At the trial of indictments charging conspiracy to steal, stealing, and robbery, there was no error in the admission of evidence respecting association of the alleged conspirators after commission of the crimes charged.   [757–758]

There was no error at a criminal trial in the exclusion of questions to a police officer by the defendant designed to elicit that in undisclosed circumstances the defendant had denied implication in the crime charged.   [758]

At the trial of indictments charging the defendant with stealing a certain automobile and with conspiracy to steal, there was no error in the admission of testimony from a coconspirator called as a witness for the Commonwealth that the defendant had showed him how to start another stolen automobile by "unclip[ping] it and touch[ing] the wire," or in the admission of a clip found in the defendant's automobile.   [758–759]

There was no error at a criminal trial in the admission in evidence of a photograph containing nothing of a derogatory nature but merely showing the defendant and a witness at a restaurant before commission of the crime charged.   [759]

INDICTMENTS found and returned on April 9, 1958, and May 7, 1958.

In the Superior Court, motions were heard by *Donahue*, J., and the indictments were tried before him.

*Albert R. Mezoff*, (*Stephen L. Mitchell* with him,) for the defendant Binkiewicz.

*Walter Powers, Jr.*, for the defendant Painten.

*Henry E. Quarles, Sr.*, (*Henry E. Quarles, Jr.*, with him,) for the defendant Hayes.

*Ruth I. Abrams*, Special Assistant District Attorney, (*Robert M. Sriberg*, Assistant District Attorney, with her,) for the Commonwealth.

WHITTEMORE, J.   These cases arose out of the robbery of the People's National Bank, Marlborough, on February 28, 1958.   At the trial in the Superior Court, the defendants

Michael Binkiewicz and Donald Painten were convicted on indictments charging armed robbery while masked and disguised, and Binkiewicz, Painten, and George E. Hayes were convicted on indictments charging larceny of an automobile and conspiracy to steal. A fourth defendant, John Bratkon, in the course of the trial, pleaded guilty to armed robbery and conspiracy and thereupon was called as a witness for the Commonwealth. The convictions depended upon his testimony. The convicted defendants have appealed under G. L. c. 278, §§ 33A–33G. The assignments of error not argued in the briefs are deemed waived. *Commonwealth* v. *Taylor*, 327 Mass. 641, 646. *Commonwealth* v. *Locke*, 335 Mass. 106, 110.

1. *Denial of Binkiewicz's motions for continuance.*

On April 9, 1958, Binkiewicz was indicted for armed robbery. On May 7, 1958, he was indicted for larceny and conspiracy. Binkiewicz was arraigned on May 14, at which time his attorney, Mr. Stephen L. Mitchell, filed motions for bills of particulars which were denied. The court on June 9, 1958, assigned the cases for trial on June 18, 1958. Mr. Mitchell on June 10, by motion filed in the armed robbery case (#53537), moved that trial be postponed until September, 1958, because of his illness and inability to try the case before that month. On June 12, after hearing, that motion was denied, subject to the defendant's exception. On June 16, a second motion was filed in #53537 for a continuance to September, signed by Mr. Mitchell and indorsed from the office of George F. Himmel, 6 Beacon Street, Boston. To the motion was attached a written statement by a physician, dated June 6, 1958. Mr. Himmel may have been an office associate of Mr. Mitchell; the latter's address was the same. On June 18, in a handwritten paper, Mr. Mitchell withdrew the defendant's motion for continuance filed on June 16, 1958, "for the reason that the court, Donahue J. has refused to hear the said motion." On June 18, also, the court ordered in each case that "George P. Lordan, Esq. . . . a practicing lawyer in this county" be appointed to represent the defendant. Mr. Lordan and Frank

Commonwealth *v.* Binkiewicz.

P. Marchetti, Esq., had appeared for Binkiewicz on June 12.[2] These appearances were withdrawn on June 13. Assignment of error 4 recites, inter alia, that on "June 18, 1958, the court asked the defendant if he would accept the services of court-appointed counsel. The defendant answered that he would if said counsel was given sufficient opportunity to prepare an adequate defence." The statement of evidence is not the function of an assignment of error. *Commonwealth* v. *Boris,* 317 Mass. 309, 312. The defendant, however, asserts the fact in his brief and we accept it.

Trial began on June 20, 1958. The transcript shows that after the jury had been empanelled and sworn, the indictments had been read, and a recess taken, Mr. Lordan said, "Your Honor, I conferred with Mr. Binkiewicz during the recess. He wants me to put on record his objections to going forward and asks his exceptions be saved. May that be done?" The judge answered, "All right."

In *Lindsey* v. *Commonwealth,* 331 Mass. 1, 2, we said, "The right to the assistance of counsel obtained by the accused is . . . one of the rights secured by the Fourteenth Amendment. *Powell* v. *Alabama,* 287 U. S. 45, 68–69. . . . [The State] is required to allow the accused a reasonable opportunity to procure counsel for himself and to allow such counsel a reasonable opportunity to prepare and to present the defence. *Allen* v. *Commonwealth,* 324 Mass. 558. *Commonwealth* v. *Blondin,* 324 Mass. 564, 567–569. *Avery* v. *Alabama,* 308 U. S. 444, 446. *House* v. *Mayo,* 324 U. S. 42, 45–46. *White* v. *Ragen,* 324 U. S. 760, 763–764." See *Chandler* v. *Fretag,* 348 U. S. 3, 9; *Jones* v. *Commonwealth,* 331 Mass. 169, 171; *Melanson* v. *O'Brien,* 191 F. 2d 963, 968–969 (1st Cir.).

The defendant had at least one attorney of record on June 18; we infer that an attorney acting for him was in court at some time on that day. The withdrawal on June 18 of the second motion did not add to or lessen the defend-

---

[2] The defendant's attorney has informed us that these appearances were pursuant to the judge's appointment of Mr. Lordan, on June 12, to represent the defendant. We have examined the motions, appearances, and withdrawals on file in the Superior Court.

ant's rights in respect of a continuance. It is the necessary conclusion, however, that the defendant, on June 18, was willing to accept Mr. Lordan as his trial attorney, if he could not have Mr. Mitchell, provided the former should have sufficient opportunity to prepare for trial.

No error is shown in respect of the denial on June 12 of the motion to continue to September. The right to representation by a particular attorney is not absolute. It must be adjusted to the reasonable requirements of other parties to the case, the orderly conduct of the courts, and the rights of other litigants. It is not uncommon, in the general interest, that an order is entered which in effect requires a much sought attorney to elect what case he will try and thus to choose, or permit the choice of, a substitute in some case. The state of Mr. Mitchell's health as disclosed in the physician's statement of June 6, 1958, was such that it was conjectural whether he would be able to try the case in September.[3] The denial of a continuance was within the discretion of the judge. *Commonwealth* v. *Millen,* 289 Mass. 441, 463. *Commonwealth* v. *Knights,* 325 Mass. 758. *Commonwealth* v. *Locke,* 335 Mass. 106, 111. We assume nevertheless that the denial entailed the obligation in the court so to decide in respect of the trial date that the defendant was not deprived of the right described in the *Lindsey* case, *supra.* An important step was the appointment on June 18 of an attorney who was acceptable to the defendant. Thereupon it became the obligation of this attorney to move for a continuance if he was unable to prepare for trial in the two days available before the trial started on Friday, June 20, and in the week end break which followed the first day of trial. We discern in Mr. Lordan's opening address to the court no suggestion of his own view that a continuance was required. The implication is otherwise. Conceivably he felt to a degree that he was appointed to try the case on June 20. But we reject the inference that he would not have

---

[3] "This is to certify that Mr. Stephen L. Mitchell, of 15 Copenger Street, Roxbury, is suffering from severe emotional tension and an anxiety state. He has been given strict orders to take an immediate vacation of at least six weeks, to preclude the possibility of complete nervous exhaustion."

moved and pressed for a continuance if, having accepted the obligations of counsel, he believed his proper representation of the defendant made a continuance necessary.

It is not clear to what action of the court the exception expressed in Mr. Lordan's remarks was taken. At best for the defendant, what counsel said was a motion of the defendant that there be a continuance. The absence of supporting contention of counsel that he needed more time, and the implication to the contrary, are fatal.

Binkiewicz asserts no way in which he was prejudiced in fact. There is no basis for concluding that the case had not been adequately prepared. Mr. Mitchell's appearance was entered on April 16, 1958. The motions of May 14, for particulars, show that he was giving attention to the case. The defendant, after noting that the transcript may be thought to show evidence to support a guilty finding and observing that this might be attributed to inadequate preparation, says: "A continuance here certainly would have been useful to the accused, but even if not, the importance of proper assistance of counsel in serious criminal charges is too large to permit speculation on its effect." It is the defendant, we think, who asks the benefit of speculation. He was represented by court appointed counsel, who was acceptable to him on a condition which we must conclude was met. Mr. Lordan's participation in the trial was such as to suggest that the defence did not suffer from lack of time. The conclusion would not be unjustified, from the events of June 12, 13, 16, and 18, that Binkiewicz was seeking to capitalize on Mr. Mitchell's illness; in any event he shows no error or prejudice.

2. *Denial on June 20, 1958, of Hayes's motion for a continuance.*

No error is shown. The motion recited the denial of the Binkiewicz motion and, on information, that Binkiewicz "refuses and will throughout the duration of the said trial refuse to testify or in any manner participate therein unless and until Stephen L. Mitchell is present and conducts his defence." Without suggesting that Hayes would have had

a right to a continuance if the recitals of his motion had been established, it is sufficient to note that they were not. The only facts before us bearing on Binkiewicz's intention in respect of the trial (section 1, *supra*) speak of his intention to coöperate with court appointed counsel rather than otherwise, and Mr. Lordan's cross-examination of witnesses reflects coöperative consultation between lawyer and client.

3. *Denial of Painten's motions for particulars.*

We pass the absence in the record of indication of the denial of the motions and of exceptions. The indictments were in the language of the statute and it does not appear that they were insufficient "fully, plainly, substantially and formally [to] set out" the charge. G. L. c. 277, § 40. In the circumstances, action on the motions was within the discretion of the judge. *Commonwealth* v. *Burke,* 339 Mass. 521, 523. *Commonwealth* v. *Norton,* 339 Mass. 592, 593. See *Commonwealth* v. *St. John,* 261 Mass. 510, 516; *Commonwealth* v. *Giacomazza,* 311 Mass. 456, 461.

4. *Amendment of an indictment.*

Hayes was indicted for stealing, on February 26, 1958, "one automobile of the property of John G. Trump." Trump on June 24, 1958, testified that his wife owned the automobile, and on July 1 (on motion filed on June 25), subject to Hayes's exception, the indictment was amended by inserting the wife's name, Elora G. Trump, in place of Trump's name.

Trump also testified that he and his wife, with their daughter, used the car on the evening of February 26, 1958; he was the operator; "[w]e drove . . . [the car] into the garage [of his residence, 9 Cambridge Street, Winchester]. . . . We removed the key, closed the doors, and went to the house." When he went to the garage the next morning the car was gone. "Q. This . . . was the property of Mrs. Trump . . .? A. Yes. We consider it to be Mrs. Trump's car. Q. . . . [Y]ou wouldn't have any authority to let anybody take the car . . .? A. Well, the way we operate I think either of us could give permission." Mrs.

Trump testified that the car was registered in her name.

General Laws c. 277, § 35A, permits an indictment to be amended "in relation to allegations or particulars as to which the defendant would not be prejudiced in his defence." Section 35 provides that a defendant "shall not be acquitted on the ground of variance between the allegations and proof if the essential elements of the crime are correctly stated, unless he is thereby prejudiced in his defence." *Commonwealth* v. *Snow,* 269 Mass. 598, 609–610, construes § 35A to authorize amendments of form and not of substance, and applies the test whether judgment of conviction or acquittal on the indictment as drawn would be a bar to a new indictment in the form in which it stood after the amendment.

General Laws c. 278, § 9, provides that "In the prosecution of crimes which relate to or affect real or personal estate, it shall be sufficient, and shall not be a variance, if it is proved on the trial that, at the time when the crime was committed, either the actual or constructive possession or the general or special property in the whole or any part of such real or personal estate was in the person or community alleged to be the owner thereof."

Trump's testimony warranted the conclusion that the automobile registered to his wife was in the actual or constructive possession of himself and his wife, and was held subject to their several dominion and control. Hayes if convicted or acquitted under the unamended indictment could not have been tried on an indictment charging the theft of this automobile as the property of Elora G. Trump. The indictment, read with c. 278, § 9, charged, in effect, the theft of an automobile, the property of John G. Trump, *or of another but in his actual or constructive possession.* This amendment was not prejudicial, for it did not charge a different crime (*Commonwealth* v. *DiStasio,* 294 Mass. 273, 278 — victim's name may be substituted for "John Doe") and there was no material variance. *Commonwealth* v. *Harney,* 10 Met. 422 ("dwelling-house . . . of . . . Walmire"; Walmire was joint lessee with another). *Commonwealth* v. *Thompson,* 9 Gray, 108 ("shop of James Stubbs";

Stubbs and another occupied the shop, owned by one Cloyes). *Commonwealth* v. *McGorty,* 114 Mass. 299 (property in possession of widow was unadministered assets of her deceased husband). *Commonwealth* v. *Blanchette,* 157 Mass. 486 (alleged owner had possession of goods as selling agent of owner). See *Commonwealth* v. *Norton,* 11 Allen, 110 (money delivered by an infant to a third party to be carried to infant's father may be alleged as owned by father). Compare *Commonwealth* v. *Morse,* 14 Mass. 217; *Commonwealth* v. *Manley,* 12 Pick. 173; *Commonwealth* v. *Wade,* 17 Pick. 395, 401–402; *Commonwealth* v. *Davis,* 9 Cush. 283; *Commonwealth* v. *Azer,* 308 Mass. 153.

*Commonwealth* v. *Snow,* 269 Mass. 598, relied on by Hayes, does not speak against the foregoing. There the indictment charged a malicious threat to Nora Downs to injure her person and property with intent to extort money from her. The evidence showed a threat to Nora C. Downs that her child would be kidnapped and Nora's place destroyed. An amendment inserting the initial "C" was held immaterial. An amendment changing the charge to a threat to Nora to injure her child was held material and prejudicial. The crime first charged, and presumably intended to be charged, as the opinion noted, was a different crime from that stated in the amendment. *Commonwealth* v. *Cooper,* 264 Mass. 378, 381–382, *Commonwealth* v. *Bracy,* 313 Mass. 121, 126, and *Commonwealth* v. *Parrotta,* 316 Mass. 307, are consistent with our holding.

5. *The charge to the jury.*

a. The judge in the course of the charge said: "Now, was there a conspiracy? Bratkon has testified as to the plans . . . [and preliminary steps] . . . that Mike [Binkiewicz] took Bratkon to Painten's apartment . . . where they discussed the robbery; . . . he and Painten discussed the guns . . . Painten was to furnish them . . . Mike was to get the clothing . . . they did get the clothing . . . they had three guns. The testimony was that all three at the bank had guns. Bratkon said that each one had a gun. *It's been asked where the third gun is. Well, you could ask where the rest of the money is, I suppose — all*

*the money . . . hasn't been recovered.*" Binkiewicz excepted to the statement emphasized in the quotation.

This was an unexceptionable statement. Apparently it dealt with an argument which sought to discredit Bratkon's testimony. It was not a charge on the facts. The suggestion that it may have implied that Binkiewicz had or was concealing the gun is far fetched. The judge said later, "There is no evidence . . . that any money . . . [or] guns [were] found on Binkiewicz." The judge may sum up testimony. G. L. c. 231, § 81. *Plummer* v. *Boston Elev. Ry.* 198 Mass. 499, 514–515. *Perry* v. *Boston Elev. Ry.* 322 Mass. 206, 208–209. See *Hathaway* v. *Checker Taxi Co.* 321 Mass. 406, 410.

b. Hayes excepted to two parts of the charge, emphasized below. The judge, continuing with his summary of Bratkon's testimony, said, "[Bratkon testified that] on Wednesday night while they were waiting for Hayes . . . [they] picked out a place to drop Mike's [that is Binkiewicz's] car, . . . to leave Bratkon's car . . . to abandon the stolen car that was to be used in the robbery . . . . They waited for Hayes, the three of them got in Mike's car, followed Hayes out to . . . Winchester . . . Hayes stopped . . . they stopped . . . [Hayes] said that he needed somebody to help him, and Mike directed Painten to go with him, and . . . Bratkon was directed to take Hayes's car, drive up the road and then back. Mike . . . [did the same in his car] until Hayes and Painten came back with a car, which was then identified as the car that was taken from the Trump garage . . . [and] subsequently found in Marlborough abandoned. . . . Hayes drove the stolen car to Waltham . . . but before . . . [that] they discussed the robbery and the purpose . . . [of use of the car] in the presence of Hayes. Have that in mind in passing upon the question of whether Hayes was an accessory before the fact of robbery, if he stole this car knowing that it was to be used in . . . a bank robbery . . . .[4] Bratkon says he . . . drove . . . [the stolen car] to Worcester [and

[4] It does not appear that any such indictment against Hayes was being tried, but there is no exception or argument in respect of this statement.

the three men other than Hayes used it the next day in the
robbery]. . . . [C]onspiracy may be proved by the testi-
mony . . . of a conspirator — by the declarations of a con-
spirator in pursuance of the promotion of a conspiracy, or
it may be proved by acts alone . . . . You can draw rea-
sonable inferences from conduct . . . . Here you've got
testimony, if you believe it, of the car being driven out fol-
lowing Hayes to Winchester and stopping there, the Trump
car being stolen, driven by Hayes to Waltham, and then
driven by Bratkon to Worcester. [a] *You could find from
that evidence, if you believe it, that all four were engaged
in the conspiracy of stealing a car that night.* . . . You
don't have to be an active participant to be a principal in
a crime. . . . Two of the persons who actively steal the
car — the testimony here is that Painten and Hayes went
after the car, that the ignition was taken out of that car, it
had black tape with a clip on it, [b] *the same kind of a clip
that was found in Hayes's car, the same kind of a clip, ac-
cording to Bratkon, that was on the car in Framingham that
Hayes delivered to him, you'd be warranted in inferring
that Mr. Hayes was familiar with that method of starting a
car, without using an ignition key,* and, of course, you'd be
warranted in finding, from the direct testimony, that he was
a conspirator as well as a thief. You would be warranted
in finding that, from the direct testimony, he stole a car for
persons who were going to commit a bank robbery, know-
ing that they were going . . . [to do so] and therefore he
aided them in the commission of the crime."

The statement [a], read in context, refers to conduct
from which it could be inferred that plans of all four for
Hayes to steal a car were being carried out. It was suf-
ficiently favorable to Hayes. The statement [b] was like-
wise proper. It reasonably included reference to Hayes
having stolen a car (and hence having started it in some
way), a clip being found in that car, and a like clip being
found in his car and on another car which had been in his
possession.[5] The inference is strong that Hayes knew how
to start a car with a clip.

[5] See note 6, *post.*

c. Binkiewicz and Painten excepted to a statement (emphasized below) near the end of the judge's summary of Bratkon's testimony. ''I don't say you should believe this testimony. It's up to you. But take all this testimony together — about the suits [that is, clothing], and the guns, and the meetings in Painten's apartment, the dropping of the bullets in Hudson, the finding of the bullet in the abandoned car, and the story of the clips and the black tape, the dropping of the car at these points, and the finding of the car by the State Police . . . where Bratkon says they had dropped it — *take all those things together and ask yourselves 'Did Bratkon make this up?' 'What motive had he for bringing these other people into it if they weren't engaged in that enterprise with him?'* . . . [M]y recollection is . . . he was not an acquaintance of Hayes . . . but . . . he had known Mike Binkiewicz and Mr. Painten . . . while they were inmates of the Massachusetts Correctional Institution. Now there has been evidence introduced to show a motive on his part for incriminating Binkiewicz. I don't recollect . . . any evidence to show why he should testify that Hayes was a participant . . . [o]r that Painten was an enemy of his . . . . [Summary of the testimony of a prison row between Binkiewicz and Bratkon.] Now you give that evidence what credence you see fit, believe it or not, as you want to. You've got a right to believe testimony, and you've got a right to disbelieve testimony. You can believe testimony in whole, and you can reject it in part. Nothing is more familiar than the rule that you've got the right to disbelieve uncontradicted evidence.''

It is argued that in this the judge told the jury in effect that he believed Bratkon, and that they should, and that the comment was particularly prejudicial because the judge did not point out that this testimony of an accomplice was uncorroborated.

General statements in our decisions as to what constitutes a charge on the facts must be read with the particular charge commented on. In *Cahalane* v. *Poust,* 333 Mass. 689, 693, we said, ''Inevitably there will be emphasis by selec-

tion and by reference but if the jury draw conclusions therefrom it will be primarily the facts of the case, properly marshalled for their review, and not the personal views of the judge, which will be speaking to them.'' The judge in effect said: In deciding whether to believe Bratkon you have to consider the improbability of his having made up a story of so many parts and the unlikelihood of his having a purpose to implicate others as to whom no motive is shown. We think that the personal views of the judge, to any extent implicit in his statements, were subordinate within the principle of the *Cahalane* case and that the charge is within the permitted area as delineated in the decisions there cited. These decisions, we said (pp. 692–693), ''have consistently upheld . . . putting before the jury possible conclusions . . . in language that is 'comprehensively strong, rather than hesitatingly barren or ineffective.' *Whitney* v. *Wellesley & Boston Street Railway,* 197 Mass. 495, 502.'' Direct indorsement of the credibility of a witness is barred, *Commonwealth* v. *Barry,* 9 Allen, 276, and the aim must be to avoid doing essentially the same thing by indirection. Statements in a charge ''going to the verge of propriety'' (*Commonwealth* v. *McDonald,* 264 Mass. 324, 335) should not be made, even if the prejudicial error, substantially risked thereby (*Cahalane* v. *Poust, supra,* does not eventuate.

It was not error to fail to charge that there was no testimony corroborating Bratkon. *Commonwealth* v. *Geagan,* 339 Mass. 487, 518.

6. *The motions for directed verdicts.*

There is no merit in the assignments of error which Hayes and Painten argue in respect of the denial of their motions. Painten contends only that Bratkon's testimony was suspect and uncorroborated. It was nevertheless evidence for the jury. Hayes's motion was addressed to the indictment for conspiracy with the other three men to steal the property of persons unknown. Much of the evidence in respect of Hayes's involvement with the others in the theft of the Trump car is summarized in the quotations

from the charge set out above (section 5). It was plainly inferable from this evidence that the action leading up to the stealing of the car was pursuant to a plan to steal it, and that Hayes joined in the plan as a result of talk with some one of the other conspirators.[6] It was not necessary to have evidence of the talk which led Hayes to join the conspiracy. The circumstantial evidence was ample. *Commonwealth* v. *Farese,* 265 Mass. 377, 380–381. *Commonwealth* v. *Galvin,* 310 Mass. 733, 745–746. *Commonwealth* v. *Ries,* 337 Mass. 565, 580.

7. *Rulings on evidence.*

a. Binkiewicz called as a witness one Ronald Maricola ''at present . . . across the street in the house of correction.'' His only significant testimony was that in May, 1958, in the Worcester House of Correction Bratkon said he ''was in there . . . for the Marlborough holdup . . . that the two men . . . that had done the job with him were going to break him out of Worcester.'' Bratkon on cross-examination had testified that he did not remember a man named Ronald Maricola, ''while . . . in Worcester.'' Later, also in cross-examination, he had answered ''No'' to the question '' [W]hile you were in Worcester, was there some talk of some of your pals going to free you from the house of correction?''[7] The district attorney, in cross-examining Maricola, elicited from him, subject to Binkiewicz's exception, the testimony that while in the United States Navy he had been absent without leave and that he had been given a bad conduct discharge. The district attorney also put in evidence under G. L. c. 233, § 21, records of Maricola's convictions: (a) larceny of forty-eight quarts of oil; (b) carrying a revolver in a motor vehicle; (c) steal-

_____

[6] The evidence shows that Binkiewicz undertook to procure Hayes to get the car, but this was excluded against Hayes. There was evidence that Hayes had at an earlier time delivered to Binkiewicz and Bratkon another automobile which was operated without ignition by means of a ''clip.'' There was a directed verdict on the count in the indictment against Hayes for stealing that car.

[7] The objection of the district attorney to this inquiry was at first sustained, but the judge suggested that the district attorney might withdraw his objection (''He will probably answer no''), and the objection was not pressed.

ing a handbag and contents; (d) stealing, in three counts ("common and notorious thief"); (e) forging and uttering six different instruments. On redirect examination, Maricola said he went absent without leave to visit his sick mother, leave having been refused, and that his bad conduct discharge was "directly from the AWOL." On recross examination he testified that part of his record "in the navy was escapes."

The rule that a witness's credibility may not be impeached by inquiry into transactions irrelevant to the issue on trial is frequently applied where the witness is a party. See *Jones* v. *Commonwealth,* 327 Mass. 491, 494, and other cases cited below. The rule applies in the cross-examination of witnesses other than parties. *Commonwealth* v. *Schaffner,* 146 Mass. 512, 515–516. *Commonwealth* v. *Churchill,* 11 Met. 538. *Commonwealth* v. *Stevenson,* 127 Mass. 446, 450. *Commonwealth* v. *Vandenhecke,* 248 Mass. 403, 404–405. When character is in issue it may be shown (apart from G. L. c. 233, § 21) only by evidence of general reputation. *Miller* v. *Curtis,* 158 Mass. 127, 131. *Davidson* v. *Massachusetts Cas. Ins. Co.* 325 Mass. 115, 123. See G. L. c. 233, § 21A.

The applicable rule called for exclusion of the evidence in respect of Maricola's absence without leave and discharge. Although the wide discretion of the judge in respect of cross-examination to test credibility has been adverted to in this connection in our decisions (see, for example, *Commonwealth* v. *Kennon,* 130 Mass. 39, 40; *Commonwealth* v. *Lammi,* 310 Mass. 159, 163; *Commonwealth* v. *Makarewicz,* 333 Mass. 575, 593–594; Wigmore, Evidence [3d ed.] § 987, note p. 591 et seq.), that discretion does not extend to the admission of collateral matters. *Commonwealth* v. *Schaffner, supra. Schmidt* v. *Schmidt,* 216 Mass. 572, 578. In the *Schaffner* case the witness was called as an expert for the defendant who was charged with adulterating milk. It was held prejudicial to admit a letter he wrote which included a proposal derogatory to his character. "The course of the trial afforded him no opportunity

to object, or to explain it. . . . [W]e are satisfied that both witnesses and parties ought to be protected from being obliged to encounter such collateral charges.'' Compare *Commonwealth* v. *Roselli,* 335 Mass. 38, 40.

We think, however, that there was no reversible error for it appears that no prejudice could have resulted to Binkiewicz. See *Schmidt* v. *Schmidt,* 216 Mass. 572, 578; *Commonwealth* v. *Homer,* 235 Mass. 526, 537; *Berlandi* v. *Commonwealth,* 314 Mass. 424, 452. *Commonwealth* v. *Theberge,* 330 Mass. 520, 523. It was unimportant to any issue whether Bratkon was lying in the matter to which Maricola testified. It is conjectural on the evidence why a jail break, if in fact anticipated, failed. The most likely hypothesis would be lack of opportunity. Bratkon, in respect of these cases, was an admitted bank robber, and his records for other crimes were in evidence. It is beyond reasonable belief that, in determining whether Bratkon was to be believed in his account of the Marlborough crime, the jury would have paused to weigh his denial of the talk in the Worcester house of correction against another convict's testimony, or would have found it significant (had they believed Maricola) that in respect of the matter of the alleged talk with Maricola Bratkon had lied. As it developed there was so little relevance in the alleged talk that the first ruling of the judge to exclude it (see footnote 7, *supra*) was soundly based; it opened unimportant collateral issues. Compare (for the rule if the derogatory evidence is presented in respect of a defendant) *Holbrook* v. *Dow,* 12 Gray, 357, 359–360; *Commonwealth* v. *O'Brien,* 119 Mass. 342, 345–346; *Commonwealth* v. *Walsh,* 196 Mass. 369; *F. W. Stock & Sons* v. *Dellapenna,* 217 Mass. 503, 506; *Commonwealth* v. *Homer,* 235 Mass. 526, 535; *Commonwealth* v. *Danton,* 243 Mass. 552, 553–554; *Karaseki* v. *Bockus,* 293 Mass. 371, 372; *Jones* v. *Commonwealth,* 327 Mass. 491, 494–495; Wigmore, Evidence (3d ed.) § 921.

b. Painten argues, but took no exception to, the exclusion of the ''hospital records and other records'' of Bratkon at Norfolk Prison Colony. The offer was by Mr.

Lordan, attorney for Binkiewicz. The documents marked were "Medical record" and "Case work," both of Bratkon. The judge said "I exclude them and save his exception." This saved only Binkiewicz's exception. In any event no error is shown. To be admissible, the records must be of a hospital within the description of G. L. c. 111, § 70. G. L. c. 233, § 79. *McClean* v. *University Club*, 327 Mass. 68, 74. *Burke* v. *John Hancock Mut. Life Ins. Co.* 290 Mass. 299, 304. See *Commonwealth* v. *Millen*, 289 Mass. 441, 482; *Commonwealth* v. *Dawn*, 302 Mass. 255, 261. Whether a hospital is included within c. 111, § 70, is a preliminary fact to be conclusively decided by the judge, unless the evidence in law did not warrant the finding. *McGaffigan* v. *Kennedy*, 302 Mass. 12, 13–14. The evidence in this regard was by an employee of the Prison Colony who brought the records and who testified that there is a "hospital" there. The judge took notice that the institution is supported by public funds.

c. Painten shows no error in the admission of a 32 caliber cartridge found in the stolen car. The witness described precisely where he found the cartridge and accounted for it at all times up to its being offered. *Commonwealth* v. *Harrison, ante,* 279, 283.

d. It was not error to admit the testimony of surveillance of Painten by a special agent of the Federal Bureau of Investigation. The agent testified that after February 28, 1958, he was assigned to watch a laundromat and the apartment where Painten lived. The exceptions were to the admission of testimony that on or about March 3 the agent saw Painten and Binkiewicz in the laundromat and thereafter he saw each one there on other occasions, about a half a dozen times in total; he also saw Bratkon there on March 11, 1958, talking to an unidentified person. The agent thereafter testified without exception that he saw Bratkon depart on a motorcycle which was later seen in front of Painten's apartment house, and that he had learned that Painten and Binkiewicz owned the laundromat. On cross-examination the agent testified that on the preceding

26th or 27th Painten and Binkiewicz had made the initial payment on the purchase. The association of conspirators after the crime is not without relevance where it is in issue whether they had anything to do with each other in connection with it. See *Commonwealth* v. *David,* 335 Mass. 686, 693–694.

e. Hayes shows no error in the exclusion of questions to Clifford A. Scott, chief of police of Marlborough. The chief had testified to physical facts and events in Marlborough. The questions[8] were apparently designed to elicit that in undisclosed circumstances Hayes, self servingly (*Commonwealth* v. *Haddad,* 250 Mass. 391, 394), had denied implication. Hayes's assertions that he had had no part in the crime could be received as evidence only in court. There was no issue of the admissibility of a confession or admission by Hayes. There is no aspect of denial of due process of law or constitutional rights.

f. It was within the discretion of the judge to allow the district attorney on redirect examination to elicit from Bratkon that Hayes showed him how to start the "Pontiac that was taken in Framingham" by showing him "how to unclip it and touch the wire." *Commonwealth* v. *Galvin,* 310 Mass. 733, 748. The admission of the clip was proper. There was adequate verification. *Commonwealth* v. *Giacomazza,* 311 Mass. 456, 470. The finding of a clip in Hayes's car was relevant to the theft of the Trump car by

---

[8] "[I]n response to any question or accusation put by any other person to Hayes . . . concerning the Marlborough robbery, did you hear the defendant Hayes deny that he knew anything about it?" "[D]o you wish to state . . . that during this two hours and a half . . . you at no time heard any question put . . . [to] Hayes concerning the . . . robbery?" ". . . [D]id you hear any . . . question [to] . . . Hayes . . . with reference to the larceny of an automobile?" ". . . whether you heard the defendant mention anything about a lie detector?" "Do you recall any conversation between . . . Hayes and Lt. Crowley concerning the search of defendant Hayes's room . . . [or concerning] the keys [taken from the defendant]?" "[W]as the defendant questioned . . . concerning a conspiracy to steal with the defendants Bratkon, Painten, or Binkiewicz?" "[W]hen did you first hear of the name George E. Hayes?" "Prior to the 7th of May had you heard of the name Hayes in connection with . . . the larceny of a motor vehicle from Winchester on. or about the 26th of February or . . . from Framingham on or about the 30th of January, 1958?" "Prior to the 7th day of May, 1958, had you received any information connecting the name of the defendant Hayes with any conspiracy to commit larceny with either [of the other three]?"

use of a clip. *Commonwealth* v. *Bonomi,* 335 Mass. 327, 341. The finding was not too remote in time or relevance. See *Sherburne* v. *Meade,* 303 Mass. 356, 360.

g. There was no error in the admission of a photograph showing Hayes and the witness Sarah Malizia at Blinstrub's restaurant in Boston taken before February 28, 1958. The witness had testified to knowing Hayes for some time. The photograph was unnecessary, but there was nothing in the photograph of a derogatory nature. It showed a smiling, friendly couple at the table.

8. The indictments did not charge capital offences and thus the cases are not within the practice prescribed by G. L. c. 278, § 33E. *Commonwealth* v. *Capalbo,* 308 Mass. 376, 385. We perceive no miscarriage of justice. See *Commonwealth* v. *Conroy,* 333 Mass. 751, 756–757.

*Judgments affirmed.*