Donald M. **PAINTEN**, Petitioner,

v.

**COMMONWEALTH OF MASSACHU-
SETTS**, Respondent.

Misc. Civ. No. 64-78.

United States District Court
D. Massachusetts.

March 31, 1966.

Louis M. Nordlinger, Boston, Mass., for plaintiff.

Willie J. Davis, Asst. Atty. Gen., Boston, Mass., for defendant.

CAFFREY, District Judge.

Petitioner Donald M. Painten was tried by a jury in the Superior Court of the Commonwealth of Massachusetts and convicted of conspiracy to steal property, the theft of one automobile, and armed robbery, masked and disguised, of the Peoples National Bank, Marlboro, Massachusetts. He was sentenced to twenty years in the Massachusetts Correctional Institution at Concord on the bank robbery conviction, ten years for the automobile theft, to be served concurrently with the twenty year sentence, and two years on the conspiracy conviction, the two years to take effect from and after the expiration of the other sentences. He is now serving these sentences.

Painten's conviction was affirmed by the Supreme Judicial Court of Massachusetts in an opinion reported at 342 Mass. 740, 175 N.E.2d 473 (1961). Thereafter he filed a petition for a writ of error in the Supreme Judicial Court. The petition was denied after a preliminary hearing. Petitioner subsequently filed the instant writ of habeas corpus in this court.

Petitioner alleges eight separate assignments of error which he feels establish that his imprisonment is illegal and in violation of the Fourteenth Amendment. It appears that all of these contentions have been raised before the state court either on appeal or in petitioner's writ of error.

By agreement of counsel the case was initially submitted to this Court for decision on the basis of a portion of the record from the Middlesex Superior Court. Thereafter, *sua sponte*, the Court ordered the parties to file a complete state court record. Still later, after a review of an 1161-page transcript of the trial held in Middlesex Superior Court, this Court *sua sponte* ordered an evidentiary-type hearing with reference to two of Painten's contentions, (1) that he had been prejudiced by the admission at the trial of articles seized by the police in

the course of an illegal search of his apartment, and (2) that he had been denied equal protection of the law on the basis of his confinement in a prisoner's cage in the Superior Court courtroom. This opinion will first consider those of Painten's contentions which are resolvable on the basis of the state court record and will conclude with consideration of the two contentions as to which evidence was offered in this court.

■ Painten's first assignment of error is that the trial judge erred in failing to grant his motion for bills of particulars. The Supreme Judicial Court thoroughly considered this point and held that the indictments were in the language of the statute and that they were sufficient, fully, plainly, substantially, and formally, to set out the charges against him. There was no denial of federal rights in this ruling.

■ Painten also contends that the amendment in the middle of the trial of the indictment charging him with larceny of an automobile denied him his right to know before trial the essential components of the charge against him. The amendment merely changed the name of the automobile owner to Elora G. Trump from that of her husband John G. Trump. This point was also fully considered by the Supreme Judicial Court, which held that the amendment did not prejudice the defendant. There was no denial of federal rights in this ruling.

■ The next assignment of error is that the trial judge erred in permitting the Commonwealth to defer sentencing of a co-defendant who had changed his plea from not guilty to guilty on some counts of the indictment in the midst of the trial, and by further permitting the Commonwealth to call the said co-defendant as a state's witness immediately after the change of plea and much before the imposition of sentence, thereby prejudicially affecting the testimony of this witness by holding over his head the threat or reward of a sentence based on his degree of cooperation. There are numerous state and federal decisions holding that a co-defendant who has pleaded guilty is a competent witness even though he has not been sentenced. See II Wigmore, Evidence, sec. 580 (3rd ed. 1940). There was no denial of a federal right in allowing the co-defendant to testify.

■ Painten's next assignment of error is that "The Commonwealth of Massachusetts erred by removing one of the co-defendants from the local jail for the purposes of private interrogation conducted by the Commonwealth's prosecuting attorney after the time indictments had been presented by the grand jury." It is difficult to understand how this action could have infringed Painten's constitutional rights. The co-defendant who was removed from the jail pleaded guilty to the charge during the trial and turned state's evidence. Painten does not allege that the interrogation of the co-defendant was carried out in such a way that the co-defendant's constitutional rights were violated. He does not allege that the co-defendant was coerced or threatened in any manner during his interrogation. In fact, Painten alleges no facts whatsoever which could possibly give rise to any violation of his constitutional rights. He is not entitled to relief on this ground of his petition.

■ Petitioner's next assignment of error is that during the trial the questioning of one witness elicited testimony that Painten had been in prison. It also appears that during the instruction to the jury the judge referred to the fact that Painten had been an inmate of the Massachusetts Correctional Institution. Petitioner argues that since Massachusetts law provides that a defendant's prior criminal record shall not be disclosed to the jury when the defendant does not testify, and since Painten did not take the stand at his trial, the admission of this testimony relating to his prior imprisonment was a denial of equal protection of the laws.

The transcript of the trial reveals that while Painten's counsel was cross-exam-

ining Bratkon, the co-defendant who had pleaded guilty, the following occurred:

Q. Prior to that, when had you last seen him?

A. Like I said, prior to that I seen him in jail.

Q. I asked you when?

A. Around '54. I imagine it was then.

A few moments later the following colloquy took place between the trial judge and the witness:

The Court: When did you last see him before January '58?

Witness: In jail, Your Honor.

The Court: What?

Witness: In jail.

The Court: When was that?

Witness: '54–'55—around there. I don't know exactly the time.

Counsel for Painten made no motion to strike this testimony at any point in the trial; nor did he ever request the trial judge to instruct the jury to disregard the testimony. See Commonwealth v. Early, Mass., 212 N.E.2d 457 (1965). Under these circumstances, it cannot be said that petitioner was denied equal protection of the laws.

■ Petitioner next contends that "the trial justice prejudiced petitioner's right to a fair trial by misleading the jury during his instructions to that body at the conclusion of the trial." Specifically, petitioner relies on (1) the trial judge's statement, "I think you will have (with you) Mr. Painten's record. I believe the records were introduced in evidence that he was twice convicted of rape * * *"; and (2) what the petitioner characterizes as a completely erroneous recollection of a witness' answer by the trial judge in his instruction.

The transcript of the trial reveals that at the conclusion of the charge the erroneous reference to Painten as the man who had been convicted of rape was called to the judge's attention during a conference at the bench. The trial judge then instructed the jury that the records referred to were Bratkon's conviction of the rape of two persons and were offered to impeach his credibility. This corrective charge removed any prejudice which may have resulted to Painten from the jury charge.

■ As to the contention that the judge stated an erroneous recollection of a witness' testimony in his charge to the jury, it should be noted that the judge had charged the jury that it was their recollection of the evidence that should govern their deliberations, not that of the judge. Furthermore, there was no objection to the portion of the charge which petitioner now claims was erroneous.

■ This was a long trial, involving four defendants and a number of charges. The trial lasted twelve days. The judge can hardly be expected to have remembered every detail of the evidence. Upon a fair reading of the entire charge it cannot be said that the trial judge so misled the jury as to deprive petitioner of due process of law.

■ Petitioner's next assignment of error is that articles which had been seized during an illegal search of his apartment were admitted into evidence against him. Before resolving Painten's contentions with regard to illegal search and seizure, the contention of the Commonwealth that Painten is not in a position to obtain the benefits of the doctrine of Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) must be considered. The Supreme Court held in Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965) that the exclusionary rule of *Mapp* did not apply retroactively to convictions which had become final by the date of its decision in *Mapp* (June 19, 1961). The record proves that Painten's conviction was affirmed by the Supreme Judicial Court of the Commonwealth of Massachusetts on June 9, 1961. Since the time within which Painten could petition for a writ of certiorari had not expired when Mapp was handed down, his conviction was not final as that term is defined in Linkletter v. Walker, supra, at 622, n. 5, 85 S.Ct.

at 1734, and, therefore, evidence obtained through an illegal search and seizure was not admissible in Painten's trial in state court, even though the trial occurred in 1958.

As a corollary it follows that at the time of the trial in Superior Court, Wolf v. People of State of Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949) was still believed by the bar to be good law. For this reason no waiver of Painten's rights under *Mapp* may properly be inferred from the failure of the record to establish an objection by his counsel on the grounds of the illegal search to the admission of the articles about whose admission he now complains. United States ex rel. Angelet v. Fay, 333 F.2d 12 (2d Cir. 1964), aff'd. on other grounds, Angelet v. Fay, 381 U.S. 654, 85 S.Ct. 1750, 14 L.Ed.2d 623 (1965); United States ex rel. Carafas v. LaVallee, 334 F.2d 331 (2d Cir. 1964); Dillon v. Peters, 341 F.2d 337 (10th Cir. 1965). It follows that Painten's claim of a violation of his constitutional rights by the illegal search and seizure must be decided on the merits.

On the basis of the state court record and the evidentiary-type hearing held in this Court, I find that on Saturday night, March 1, 1958, Emmett McNamara and Herbert Maxwell, two plainclothes officers of the Boston Police Department, were on patrol in an unmarked police car. About 8:30 p. m., they were traveling along Dartmouth Street behind a Ford sedan occupied by two men in soft, black hats. At the intersection of Dartmouth Street and Columbus Avenue, the sedan crossed Columbus Avenue and pulled up in front of a liquor store while the police car stopped at the traffic light. Since there had recently been a rash of liquor store holdups, Officer McNamara kept an eye on the sedan and saw petitioner Painten get out of the car and enter the store. McNamara confirmed his identification from a "mug" shot of Painten which he had in his pocket. The sedan moved slowly up the street, turned around, and was returning as McNamara, his suspicions aroused by the car's movement, crossed the intersection and pulled up before the liquor store. When the driver of the sedan saw Officer McNamara in the unmarked police car he took off down the street with a burst of speed. McNamara wheeled the squad car around and gave chase, using his siren.

After chasing the sedan for several blocks McNamara overtook and stopped it. As he approached the car he recognized the driver, George Ash, who he knew had been convicted of holdups in the past and had served time in prison. McNamara ordered Ash out of the car and asked him why he had run. Ash said McNamara had "scared" him. McNamara could see that Ash was not carrying a weapon. He looked in the car and after some conversation let Ash go on his way, in the hope that Ash would lead him to Painten. Ash returned in the direction of the liquor store.

McNamara returned to the liquor store and showed Painten's picture to the clerk, who told him that Painten lived in a nearby apartment building. He then drove to the address given by the clerk and in a parking lot behind the apartment building found the car that Ash had been driving. A check of the front door disclosed Painten's name under one of the doorbells. Knowing Painten and Ash, and the reputation of this apartment building, McNamara returned to his car and put in a radio call for two more police officers.

McNamara was interested in Painten and Ash because he considered them likely suspects for a loan company robbery that had taken place earlier on the same day. McNamara had no information connecting them with the loan company holdup or, for that matter, with any other crime; he had not set out on patrol with Painten or Ash particularly in mind as suspects; on the contrary, his suspicions focused on them only when they crossed his path. McNamara felt that Ash was a likely suspect for the loan company holdup because he had been convicted of holdups in the past and that Painten was a likely suspect because he

had a record, though McNamara did not know what it was. McNamara had seen Painten in the company of men that he knew from police work. The only description of the holdup men which McNamara had available was that they were "two white men, one tall, one a little shorter." As Officer McNamara candidly admitted, there were "plenty of other fellows around the South End that could possibly have gone into the same category" as Painten and Ash if they had come across his path.

When Officers Megnia and Rufo arrived at the apartment building in response to his call, McNamara told them he and Maxwell were "going up to see some fellows up in an apartment, if we can find them," and sent Rufo to watch the rear of the building. McNamara, Maxwell and Megnia then approached the apartment building, found the outer door unlocked, and entered. Leaving Megnia to guard the stairway, McNamara and Maxwell went to Painten's third floor apartment and knocked on the door. Painten answered the door, opening it only a few inches, and asked "Who's there?" McNamara showed his badge and replied, "It's the Boston Police. We'd like to talk to you." Painten asked if they would wait a minute, McNamara replied that they would, and Painten closed the door. While the door was closed McNamara heard what sounded like a window being raised and lowered inside the apartment. A few seconds later Painten opened the door. McNamara and Maxwell entered the apartment.

Inside, in the kitchen, they found George Ash and a woman identified as Doris Painten. Painten stated that the apartment was his. Noticing a bulge in Ash's pocket McNamara stuck his hand into it and found about $200.00 in ten and twenty dollar bills stuffed in the pocket. There was some conversation between McNamara and the occupants of the apartment. No search of Painten's person or his apartment took place at this time.

In the meantime, from his vantage point behind the building, Officer Rufo had seen someone open a window in Painten's apartment and drop a bag onto the fire escape. The two kitchen windows of Painten's apartment faced the back of the building. On the third floor level, the fire escape extended to a point on the wall about midway between these two windows. On the second floor level, however, the fire escape extended to the edge of the building, so that it was directly under the corner window of Painten's kitchen, the window from which the bag was dropped. The bag fell to the second story fire escape and landed with a metallic clang. As soon as the window was closed, Officer Rufo went around to the front of the building, entered, went up to Painten's apartment, into the kitchen, and told McNamara "They threw a bag out the window." About three minutes had passed since McNamara's entry into Painten's apartment.

While McNamara, Maxwell and Megnia kept an eye on Painten and Ash, Rufo raised the venetian blind, opened the window, stepped out onto the fire escape, went down the ladder to the second floor level, picked up the brown paper bag and started to rip it open. He saw the muzzle of a .45 and immediately returned to Painten's apartment. In the kitchen McNamara opened the bag and discovered, wrapped in three sheets of waxed paper, a .32 caliber automatic and a .45 caliber revolver, together with nine .32 caliber bullets and thirteen .45 caliber bullets scattered about the bag. He asked whether anyone knew anything about the pistols and Painten responded that he knew nothing about them. McNamara then placed Painten under arrest "for suspicion of a holdup on a loan company," and proceeded to make a thorough search of the apartment.

During the search, McNamara discovered and seized a box of .32 caliber shells found on a kitchen shelf and about $980.00 found under the mattress in Painten's bedroom. Painten was still in the apartment when these articles were

seized. After the arrest more police were called in and Painten and the others were taken to Station 4. Some time after Painten had been taken to the station, exactly how long does not appear in the record, except that it was later in the same evening, the police found and seized a roll of waxed paper. The roll of waxed paper, the sheets of waxed paper, the paper bag, the guns, the ammunition, and the money were all taken to the station. Over the weekend, FBI agents made a list of the serial numbers of the money found under Painten's mattress.

At Painten's trial in state court, all these items except the money were introduced into evidence. There was testimony that the bag with the guns and ammunition had been thrown from Painten's apartment and recovered from the fire escape. There was testimony that the roll of waxed paper came from Painten's apartment and that the sheets of waxed paper in which the guns had been wrapped were torn from this roll. There was testimony that the box of .32 caliber bullets was found in Painten's apartment. The serial numbers of some of the money taken from Painten's apartment were read into evidence and there was testimony that these serial numbers matched those of bills that had been taken in the robbery of the Peoples National Bank. There was testimony that the serial numbers had been taken from money found in Painten's apartment.

I rule, on the basis of this record, that Officer McNamara did not have probable cause to arrest Painten when he went to Painten's apartment and sought entrance thereto. All that he knew when he knocked on Painten's door was that Painten had some sort of a record and that he had seen Painten in a car with Ash who he knew had a record for holdups. I find that the officers went to the apartment intending to ask Painten a few questions and then to arrest him "on suspicion of the loan company job." In so finding I have in mind the statement by Officer McNamara at the hearing here that if Painten had not gone from the car into the liquor store he would have asked him and Ash a few questions and then "I believe I would have taken them to Station 4 on suspicion of that holdup that day." I likewise have in mind that the calling of additional officers by radio and the placing of officers to guard both front and rear exits of the apartment building is far more indicative of a planned arrest than of an intended interview.

It follows that the entrance into Painten's apartment without a warrant and absent any probable cause to arrest any occupant thereof was "under color of their police authority" (Johnson v. United States, 333 U.S. 10, 16, 68 S.Ct. 367, 370, 92 L.Ed. 436 (1948)) and there was no "valid basis in law for the intrusion." Id., p. 17, 68 S.Ct. p. 370.

■ Since the officers had no probable cause to arrest when they entered the apartment they cannot retroactively validate the entry or arrest by reliance on what they discovered as a result of the illegal entry. Johnson v. United States, supra, at p. 16, 68 S.Ct. 367. " 'A search is not to be made legal by what it turns up. In law it is good or bad when it starts and does not change character from' what is dug up subsequently." Ker v. State of California, 374 U.S. 23, at 41 n. 12, 83 S.Ct. 1623, at 1633, 10 L.Ed.2d 726, quoting United States v. DiRe, 332 U.S. 581 595, 68 S.Ct. 222, 92 L.Ed. 210 (1948).

■ I rule that the guns, bullets, sheets of waxed paper, roll of waxed paper, paper bag, and the serial numbers of the bills obtained during the course of the search were all obtained in violation of Painten's constitutional rights and that their use as evidence at his trial was a denial of his constitutional rights.

In view of this disposition of the allegation of illegal search I do not reach Painten's contentions with regard to the "cage" located in the Middlesex Superior Court courtroom. In any event, these contentions will be moot on re-trial since the cage has been removed from the Middlesex Superior Court courtroom.

The petition for writ of habeas corpus is allowed and the Commonwealth of Massachusetts is directed to either bring Painten to a new trial on these charges within sixty days from the filing of this opinion or to discharge him from custody.